**PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, North Atlantic Energy Corporation, Northeast Utilities, and Northeast Utilities Service Company, Plaintiffs,**

v.

**Douglas L. PATCH, Chairman of the Public Utilities Commission of the State of New Hampshire, Bruce L. Ellsworth, Commissioner of the Public Utilities Commission of the State of New Hampshire, and Susan S. Geiger, Commissioner of the Public Utilities Commission of the State of New Hampshire, Defendants.**

District of N.H. Civil Action No. 97–97–JD.
District of R.I. Civil Action No. 97–121L.

United States District Court,
D. New Hampshire.

April 28, 1997.

Jeffrey S. Cohen, Sulloway, Hollis & Soden, Concord, NH, John B. Nolan, Allan B. Taylor, James J. Tancredi, Day, Berry & Howard, Hartford, CT, Bruce Gladstone, Cameron & Mittleman, Providence, RI, for Plaintiffs.

Steven M. Houran, Acting Atty. Gen., Wynn Arnold, Asst. Atty. Gen., Stephen J. Judge, Associate Atty. Gen., Attorneys General Office, Concord, NH, Steven W. Phillips,

James K. Brown, Special Counsel, Foley, Hoag & Eliot, Boston, MA, for Defendants.

Charles G. Douglas, III, C. Kevin Leonard Douglas, Robinson, Leonard & Garvey, P.C., Concord, NH, Terrance A. Corrigan, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Cabletron Systems, Inc.

James R. M. Anderson, Michael W. Holmes, Office of Consumer Advocate, Concord, NH, for Office of the Consumer Advocate of the State of New Hampshire.

Mark W. Dean, Dean, Rice & Howard, Manchester, NH, for New Hampshire Elec. Co-op., Inc.

Joshua L. Gordon, Concord, NH, for Campaign for Ratepayers Rights.

F. Anne Ross, Concord, NH, for Retail Merchants Ass'n.

John J. Ryan, Casassa and Ryan, Hampton, NH, for Community Action Programs of the State of New Hampshire.

Carlos A. Gavilondo, Westborough, MA, David A. Garfunkel, Gallagher, Callahan & Gartrell, Concord, NH, for Granite State Elec. Co.

Peter H. Grills, David E. Crawford, O'Neill, Grills, & O'Neill, P.L.L.P., St. Paul, MN, Thomas Arnold, III, Asst. City Sol., Manchester, NH, for City of Manchester.

Paul K. Connolly, Jr., H. Glenn Alberich, Scott J. Mueller, Damian R. LaPlaca, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Boston, MA, Jacqueline Lake Killgore, Public Utility Policy Institute, Concord, NH, for Unitil Corp., Concord Elec. Co., Exeter & Hampton Elec. Co. and Until Power Corp.

## OPINION AND ORDER

RONALD R. LAGUEUX, Chief Judge.*

This action stems from a recent undertaking by the Public Utilities Commission of the State of New Hampshire ("Commission") to restructure the state's electric utility industry. Plaintiffs, Public Service Company of New Hampshire ("PSNH"), North Atlantic Energy Corporation ("NAEC"), Northeast Utilities ("NU"), and Northeast Utilities Ser-

---

* Chief Judge of the District of Rhode Island, sitting by designation.

vice Company ("NUSC"), seek injunctive and declaratory relief to bar the implementation and enforcement of the Commission's Final Plan ("Final Plan" or "Plan") for restructuring the industry, as well as an interim cost-recovery order adopted pursuant to the Plan, issued on February 28, 1997. As grounds for relief, plaintiffs assert, *inter alia*, that the Commission's Plan is preempted by federal law, attempts to assert state power beyond the limits allowed by the commerce clause, and results in an impairment of contractual rights and a confiscation of property in violation of certain federal and state constitutional provisions.

The Court is now faced with a threshold question in this litigation: whether the Court should abstain from reaching the merits of the case pending the completion of state administrative proceedings and appeals relating to the restructuring Plan. For the reasons that follow, the Court concludes that the matter is ripe for adjudication, and that abstention is not warranted, except as to a limited range of issues for a limited time as outlined herein.

## I. Background

The question presently before the Court cannot be resolved without an understanding of the background in which the dispute has reached this forum. For this reason, the Court offers a sketch of PSNH's position in New Hampshire's electric utility industry, as well as a summary of some of the central aspects of the restructuring Plan adopted by the Commission. With that foundation, the Court will be able to put the legal arguments raised by plaintiffs and others in proper perspective.

### A. The Recent History of PSNH

PSNH is New Hampshire's largest electric public utility, providing service to approximately 70% of the state's residents. In the early 1970's, PSNH began planning and constructing the nuclear generating station at Seabrook, New Hampshire, to meet a forecasted need for a substantial increase in the region's energy needs. While PSNH anticipated completing Seabrook by 1979, a combination of regulatory reforms and increasing

public opposition to nuclear power delayed progress significantly, so that the first (and only) generating unit was not completed until 1986. Continuing public opposition engendered further delays, so that Seabrook did not commence commercial operations until June 30, 1990.

While the delays dramatically increased the cost of the project, New Hampshire law prevented PSNH from recovering these costs from ratepayers through rate increases until the plant became operational. Thus, PSNH was required to obtain commercial financing in order to continue the project. On January 28, 1988, unable to service the mounting debt supporting its investment in Seabrook, PSNH was forced to seek protection under the bankruptcy laws, the first bankruptcy filing of a major regulated public utility since the Great Depression.

The State of New Hampshire, recognizing that the pending reorganization of its largest electric utility was of paramount public importance, sought and was granted full intervenor status in the bankruptcy proceedings, and was an active participant in the reorganization of the company. As part of the bankruptcy case resolution, NU invested $2.3 billion to acquire PSNH, and assumed the operations of Seabrook through an NU affiliated company, NAEC. The State played a key role in negotiating both the acquisition and the manner by which NU would be allowed to recover its investment in PSNH from New Hampshire ratepayers. To this end, NU and the State, acting through its Governor and Attorney General, entered into a formal written agreement, dated November 29, 1989, to express the obligations of NU and of the State with respect to the acquisition of PSNH ("Rate Agreement"). The Rate Agreement was ratified by the New Hampshire legislature and the Commission.

Under the Rate Agreement, PSNH was able to continue operating as an integrated electric utility, providing bundled generation, transmission, and distribution service at rates set by the Commission. The hallmark of the Rate Agreement was the establishment of a ratemaking scheme that would allow NU to recover the costs of acquiring

and operating PSNH and Seabrook over time, while recognizing the short-term interests of New Hampshire ratepayers, who would ultimately bear these costs through rate increases. In particular, NU agreed to defer collection of its costs to the long term, instead of passing the costs on to ratepayers immediately. The Rate Agreement established a fixed-rate period of seven years, during which electric rates would rise 5.5% a year. While a substantial portion of NU's investment would be recovered during the period of scheduled increases, the Rate Agreement also provided that the remainder of the investment, plus a return, would be recovered from ratepayers beyond the seven-year period. Thus, the Rate Agreement achieved the desired balance: NU would ultimately recover its acquisition costs, while the burden to New Hampshire ratepayers would be spread over time.

Despite this deferral of cost recovery, New Hampshire's average electric rates are currently among the highest in the nation. Because PSNH serves 70% of the market, the great portion of these rates is governed by the annual 5.5% rate increases provided in the Rate Agreement. This fact, coupled with the success of recent efforts to foster competition in the electric utility industry on the federal level and in other states, prompted the New Hampshire legislature to consider competitive alternatives for the state's electric utility industry, to take effect soon after the May 31, 1997 expiration of the fixed-rate period set by the Rate Agreement.

## B. The Restructuring of the Electric Utility Industry

The Electric Utility Restructuring Act, N.H.Rev.Stat. Ann. §§ 374–F:1 to F:6 (Supp. 1996) ("RSA 374–F"), provides for the restructuring of New Hampshire's electric utili-

ty industry in order to inject retail competition into the market. As outlined in RSA 374–F:1(I), the competitive market will hopefully "develop a more efficient industry structure and regulatory framework that results in a more productive economy by reducing costs to consumers while maintaining safe and reliable electric service with minimum adverse impacts on the environment." To achieve these goals, the legislature directed the Commission to develop a statewide restructuring plan to implement retail choice for all customers of electricity, to take effect by January 1, 1998. See RSA 374–F:4(I).

Pursuant to this mandate, and after a series of hearings on the matter, on February 28, 1997 the Commission issued its Final Plan for restructuring the industry,[1] as well as an appended "Legal Analysis" confirming the validity of the restructuring scheme adopted by the Commission.[2] While the Final Plan is comprehensive and highly detailed, at this juncture the Court will simply highlight some of the key features that are relevant to the present litigation.

First, and most centrally, the Final Plan requires New Hampshire's electric utilities to unbundle their retail electric service into the generation, transmission, and distribution components, and to open their existing distribution channels (i.e., poles and lines) to all consumers in their franchise area on a non-discriminatory basis.[3] This unbundling creates retail choice for the generation function—customers will choose from among a number of different electricity suppliers, and then have power delivered to them over the "open access" wires of the local distribution companies. Under the Final Plan, consumers will pay their chosen suppliers the rate set by the competitive market, while the rates for access to the distribution channels

1. See Public Utilities Commission, Final Plan in Docket No. DR 96–150: Restructuring New Hampshire's Electric Utility Industry (February 28, 1997). The Commission adopted this Plan through a formal order. See Public Utilities Commission, Order No. 22,514 in Docket No. DR 96–150, Order Adopting Final Plan and Legal Analysis (February 28, 1997).

2. This lengthy Legal Analysis (132 pages) was also formally adopted by the Commission through Order No. 22,514. See supra note 1. The

Legal Analysis dismisses many of the claims raised in this lawsuit, as PSNH and others had apparently raised many of these same arguments at preliminary hearings before the Commission.

3. This requirement complements the non-discriminatory, open access rule that governs the transmission function at the national level, issued and administered under the authority of the Federal Energy Regulatory Commission.

will be set by the Commission in a ratemaking proceeding. As for the transmission function, although the Final Plan acknowledges that the Federal Energy Regulatory Commission ("FERC") retains ultimate authority over transmission issues, a utility must first submit transmission tariffs to the Commission for approval, before these tariffs can be filed with FERC.

Further, in order to protect and promote competition in all phases of electrical service, a utility that wishes to serve the distribution function must divest itself of all its generation assets by December 31, 2000. In addition, a distribution utility must sell-off all of its rights to obtain power for distribution under existing power purchase contracts, and sever all corporate ties with affiliated companies that supply competitive electric service in its franchise territory. By these measures, no one utility will have the opportunity to dominate both the generation and distribution of electricity in New Hampshire, in the hope that no one utility will be in a position to exploit consumers through the exercise of market power.

Both the enabling statute and the Final Plan recognize that the process of restructuring and divestiture of generating assets would leave currently integrated utilities unable to recover some portion of their investments through the competitive market. To allow utilities to recover these sunken costs, the Commission is authorized to include a "stranded cost recovery charge" to the rates set for distribution access. *See* RSA 374–F:4(V). RSA 374–F:2(IV) defines stranded costs as:

> costs, liabilities, and investments, such as uneconomic assets, that electric utilities would reasonably expect to recover if the existing regulatory structure with retail rates for the bundled provision of electric service continued and that will not be recovered as a result of restructured industry regulation that allows retail choice of electricity suppliers, unless a specific mechanism for such cost recovery is provided.

The determination of the stranded cost recovery charge allowed to each utility is a long-term proposition, as the Commission is empowered to set this charge in the context of a utility-specific rate case proceeding to take place some time after the institution of competition. *See* RSA 374–F:4(V).

However, the legislature also provided for a faster, short-term determination of such recovery, in order to accelerate the transition to a fully competitive market. Pursuant to RSA 374–F:4(VI), the Commission is authorized to set an interim stranded cost recovery charge for each utility, based on the Commission's preliminary determination of a utility's ultimate level of stranded costs. Such interim recovery is to be in effect for a two-year transitional period, and may be adjusted if and when (1) the utility shows that "severe financial hardship" results from the currently allowed level of recovery, or (2) the Commission sets the permanent stranded cost recovery charge for the utility after a formal rate case proceeding. *See* RSA 374–F:4(VI), (VII).

As required by the statute, the Final Plan sets forth the methodology for calculating both interim and permanent stranded cost recovery charges. While the Final Plan recognizes cost-of-service ratemaking methodology generally, the Commission departs from the traditional cost-based model by introducing a "regional average rate benchmark" component to the ratemaking calculus. Through this approach, the Commission can deny full recovery of stranded costs, on both an interim and permanent basis, to a utility whose costs and rates exceed the regional average rate benchmark. On the basis of this regional ratebenchmark method, the Commission issued a series of orders, contemporaneously with the issuance of the Final Plan, in which it set the interim stranded cost recovery charges to be allowed for each utility during the first two years of competition.[4]

Finally, recognizing that competition is scheduled to begin on January 1, 1998, the Final Plan sets forth a series of administrative measures needed to ensure a successful

---

4. *See* Public Utilities Commission, Orders No. 22,509 to 22,513 in Docket No. DR 96–150: Orders Addressing Requests for Interim Stranded Cost Charges (February 28, 1997).

transition to competition by the end of the year. In particular, the Plan requires each New Hampshire electric utility to submit a comprehensive filing no later than June 30, 1997, setting forth the utility's plan for complying with the requirements of the restructuring plan and the accompanying orders.[5] Additionally, by December 31, 1997 each utility must submit a plan to accomplish any divestitures of generation assets required by the Plan. Lastly, after the June 30 filing, the Commission will hold additional utility-specific hearings to determine whether each filing complies with the requirements of the Final Plan, and will afford each utility an opportunity to voice any objections to the Plan or the interim stranded cost orders based on the facts and circumstances particular to that company.

While the features of the restructuring plan discussed so far are generally applicable to all electric utilities in New Hampshire, one of the orders issued in conjunction with the Final Plan concerns PSNH alone, and is thus of particular importance here. In Order No. 22,512, the Commission addressed the interim stranded cost charges to be allowed to PSNH, effective January 1, 1998.[6] In that order, the Commission expressed its conclusion that PSNH's rates exceeded the regional average rate benchmark. For that reason, PSNH would not be allowed full recovery of its stranded costs during the interim period.[7]

## C. The Present Litigation

Plaintiffs filed this action on March 3, 1997, challenging the legality and enforce-

ability of the Final Plan and interim stranded cost orders insofar as they relate to PSNH. Plaintiffs' thirteen-count complaint raises a host of federal statutory and constitutional grounds for invalidating the Commission's Plan for restructuring the state's electric utility industry. On the statutory level, plaintiffs assert that the Final Plan attempts to assert the state's regulatory authority over conduct within the exclusive jurisdiction of FERC and other federal agencies. Thus, PSNH contends that the Final Plan is preempted by certain provisions of the Federal Power Act (Counts I–III),[8] the Public Utilities Regulatory Policies Act of 1978 (Count IV),[9] and the Public Utility Holding Company Act (Count VI).[10]

PSNH also maintains that the Final Plan is constitutionally flawed in a number of respects. First, PSNH claims that the Plan's provisions for "open access" and less-than-full recovery of costs work a physical taking and a regulatory confiscation of property without just compensation, in violation of the fifth and fourteenth amendments to the United States Constitution and Part I of Articles 12 and 23 of the New Hampshire Constitution (Counts V, IX, and X). PSNH also contends that the denial of full cost-recovery is irrational and unfair, and thus denies the company its right to substantive due process (Count V). Additionally, PSNH claims that the rate-setting methodology adopted by the Commission effects a repudiation of the deferred cost-recovery provisions of the Rate Agreement between NU and the State,[11] in

---

**5.** These compliance filings must include, among other matters: a plan to unbundle the generation function from transmission and distribution; a 1996 cost-of-service study broken down into the generation, transmission, and distribution functions; a plan to implement procedures for load estimation and for the transfer of metering and billing data; and a proposed schedule of open access distribution tariffs.

**6.** *See* Public Utilities Commission, Order No. 22,-512 in Docket No. DR 96–150: Order Addressing Request for Interim Stranded Cost Charges (February 28, 1997).

**7.** The Court recognizes that, subsequent to the filing of this lawsuit, the Commission has decided to rehear certain matters addressed in the Final Plan, and has stayed limited parts of the

Final Plan, as well as the interim stranded cost orders, pending this rehearing. The Court will address the substance and import of these actions as they become relevant to the discussion.

**8.** 16 U.S.C. §§ 791a to 825r.

**9.** Pub.L. No. 95–617, 92 Stat. 3117 (codified as amended in scattered sections of 15 and 16 U.S.C.).

**10.** 15 U.S.C. §§ 79 to 79z–6.

**11.** As evidence of this repudiation, PSNH cites the Legal Analysis appended to the Final Plan, wherein the Commission states and defends its conclusion that the Rate Agreement is not an enforceable obligation of the State.

violation of the contracts clause (Count XI).[12] Lastly, PSNH contends that the restructuring and divestiture requirements attempt to extend the state's regulatory authority to entities and conduct beyond the state's jurisdictional boundaries in violation of the commerce clause (Count VII), and that these requirements deny PSNH and its affiliates certain first amendment rights (Count XII).[13]

The complaint also seeks injunctive relief, arguing that PSNH will suffer irreparable harm if the Final Plan, and any steps to bring about the restructuring by January 1, 1998, are not enjoined. Specifically, because the Commission has adopted the regional average rate benchmark approach instead of traditional cost-of-service ratemaking methodology, PSNH contends that it will lose the protection of Financial Accounting Standard No. 71 ("FAS 7"),[14] and will thus be required to write-off more than $400 million worth of assets from its financial books. Plaintiffs argue that this substantial write-off, together with the alleged repudiation of the Rate Agreement between NU and the State, would place them in default of a number of loan agreements and other credit arrangements, prompting creditors to seek accelerated collection of over one billion dollars worth of debt. Plaintiffs claim that this sequence of events would almost certainly force PSNH to seek bankruptcy protection once again.[15]

Upon reviewing the pleadings in the case and after holding an initial conference with the parties and a number of potential intervenors,[16] it became readily apparent that the threshold consideration in this dispute is that of abstention—whether the Court should (or, indeed must) abstain from reaching the merits of the case until all further state proceedings concerning the Final Plan have been concluded.[17] To aid in the assessment of this issue, the Court held a hearing limited to the question of abstention, during which the parties presented arguments and offered evidence relevant to the Court's analysis.[18] At the conclusion of the hearing, the Court took the matter under advisement. It is now in order for decision.

## II. Analysis

Although the Court had asked the parties to focus primarily on the question of abstention, at argument counsel raised the additional preliminary question of whether this litigation was ripe for adjudication. Of course, ripeness and abstention are distinct analytical concepts: ripeness raises a question of justiciability, i.e., whether there is an actual and ongoing "case or controversy" between the parties, while the abstention doctrines require a federal court to consider whether it should decline to hear a case over which it properly has jurisdiction, generally for rea-

---

12. PSNH contends that this repudiation also violates central provisions of the bankruptcy court's order confirming the plan for the reorganization of PSNH (Count VIII).

13. In addition, plaintiffs cite these alleged constitutional violations as the basis for a claim pursuant to 42 U.S.C. § 1983 (Count XIII), and seek attorneys' fees under § 1988.

14. FAS 71, promulgated by the Financial Accounting Standards Board, sets forth the accounting principles and rules for regulated utilities. To simplify greatly, FAS 71 allows regulated utilities to carry certain regulatory assets on their books instead of charging them against income, as long as certain conditions are met.

15. This chain of events was the subject of an evidentiary hearing held before this Court on March 20–21, 1997.

16. The Court has heard arguments on nine motions to intervene in this litigation, filed by Cabletron Systems, Inc.; the Office of the Consumer

Advocate of the State of New Hampshire; the New Hampshire Electric Cooperative; the Campaign for Ratepayers Rights; the Retail Merchants Association of New Hampshire; the Community Action Programs of New Hampshire; the Granite State Electric Company; the City of Manchester, New Hampshire; and Unitil Corporation, Concord Electric Company, Exeter & Hampton Electric Company, and Unitil Power Corporation (collectively "Unitil"). The Court currently has these motions under advisement, and has deferred judgment on them pending the resolution of the ripeness and abstention questions before the Court.

17. The court may raise issues of justiciability and abstention *sua sponte*. *Pustell v. Lynn Pub. Sch.*, 18 F.3d 50, 51 & n. 1 (1st Cir.1994).

18. The potential intervenors were also given an opportunity to be heard on this issue, as the Court allowed them to file briefs as *amici curiae*.

sons of federal-state comity or judicial economy. *See Pustell v. Lynn Pub. Sch.,* 18 F.3d 50, 52–53 (1st Cir.1994) (discussing concerns underlying doctrines of ripeness and abstention). However, noting that ripeness and abstention present similar legal issues and concerns for this case, the Court finds it proper, and indeed necessary, to address both doctrines at this early stage of the litigation.

## A. Ripeness

The doctrine of ripeness, rooted in Article III, Section 2 of the United States Constitution, limits the jurisdiction of federal courts to actual "cases and controversies." Questions of ripeness are governed by the familiar two-part inquiry set forth in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), whereby a court considers the fitness of the issues for immediate review and the hardship to the litigant should review be postponed. *Id.* at 148–49, 87 S.Ct. at 1515–16. Under the "fitness for review" inquiry, a court considers whether the issues presented are purely legal, as opposed to factual, and the degree to which any challenged action is final. *See W.R. Grace & Co. v. United States E.P.A.,* 959 F.2d 360, 364 (1st Cir.1992). The various factors that enter into a court's assessment of fitness include whether the claim involves uncertain and contingent events that may not occur as anticipated or at all; the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse. *See Riva v. Massachusetts,* 61 F.3d 1003, 1009–10 (1st Cir.1995). As for the "hardship" prong, at this stage of the inquiry a court asks whether the challenged action creates a "direct and immediate" dilemma for the parties, such that judicial intervention is required to relieve plaintiff of the need "to choose between costly compliance and noncompliance, at this risk of punishment." *W.R. Grace,* 959 F.2d at 364.

The dispute over the ripeness of the present litigation centers on the fitness part of the inquiry, and specifically on the question of whether the Commission has taken action that is sufficiently "final" such that review would be appropriate. In short, the Commission urges that the process of restructuring the electric utility industry is still ongoing, and that the claims asserted by PSNH are therefore hypothetical. The Commission notes that further administrative hearings have already been scheduled, as contemplated by the Final Plan, to review utility compliance filings and to address other utility-specific concerns. In addition, a further set of hearings will be held sometime in the future to determine final stranded cost charges. Finally, the Commission points out that as of yet no rates have been set for PSNH, and that, in any event, the rates incorporating the interim stranded cost charges will not become effective prior to January 1, 1998.

■ While recognizing that further hearings will be held before the restructuring takes effect, the Court submits that the claims advanced in this lawsuit concern matters for which the Commission has indeed reached its "final" decision. Adopted pursuant to the legislative mandate of RSA 374–F, the Final Plan amounts to a conclusive act of legislation, as it is (as its name implies) the Commission's definitive plan for restructuring the electric utility industry. It is the culmination of a process in which the Commission first issued a preliminary plan, requested comments on the preliminary plan, and held a series of hearings to address these comments. The process concluded when the Commission issued its Final Plan, which sets forth, *inter alia,* how the electric utility industry will be structured; how utilities must operate; and how rates will be set as of January 1, 1998. As to these determinations—which give rise to the majority of the claims in the complaint—the Commission's work is done, as the Final Plan does not contemplate further revision of these matters.[19] Thus, because this case raises concrete legal challenges to matters on which the Commission has taken final action, plaintiffs' claims can be asserted at this time.

19. The Court recognizes that the Commission has recently granted a motion to rehear a limited range of issues relating to determinations made in the Final Plan. The Court will address how the Commission's action affects the ripeness analysis later in this discussion.

■ In the alternative, the Commission submits that this case is unripe because PSNH has not yet appealed the Commission's Final Plan to the New Hampshire Supreme Court. Citing *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908), the Commission argues that appeal to the New Hampshire Supreme Court is an integral part of the legislative process, because New Hampshire law provides for a direct appeal of the Commission's orders to the State Supreme Court, which can set aside or vacate orders for "errors of law" or if the orders are "unjust or unreasonable." *See* N.H.Rev.Stat. Ann. §§ 541:6, 541:13. Therefore, noting that "[l]itigation cannot arise until the moment of legislation is past," *Prentis*, 211 U.S. at 228, 29 S.Ct. at 70, the Commission maintains that this case has not matured.

While the issue has not been raised by PSNH, the Court initially questions whether the restructuring statute provides a basis for such a direct appeal to the New Hampshire Supreme Court at all. The enabling legislation explicitly states that "[a]ny administrative or adjudicative proceeding or public hearing relating to this chapter shall be subject to the provisions of RSA 541–A." RSA 374–F:4(XI). The referenced section, the New Hampshire Administrative Procedure Act, does not afford a direct appeal to the Supreme Court, but instead provides that an appeal lies with the Superior Court for Merrimack County. *See* N.H.Rev.Stat. Ann. § 541–A:24. The chapter upon which the Commission relies, §§ 541:1 to 541:22, is a more generally applicable section, which does in fact provide that an aggrieved party may petition the Supreme Court directly for review of an order or decision of the Commission, although only after the party has sought a rehearing by the Commission. *See* § 541:6.

Nevertheless, assuming *arguendo* that such direct review is available in this instance,[20] the Court finds the Commission's argument unpersuasive, as review by the New Hampshire Supreme Court clearly would be a judicial act, not an extension of the legislative process. In *Prentis,* the Virginia state courts sat as a second administrative body when hearing appeals from ratemaking orders, as the courts were actually free to set the rates they concluded were proper; thus, state court review was truly an extension of the legislative process. *See Prentis,* 211 U.S. at 224–26, 29 S.Ct. at 68–69; *see also New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 371–72, 109 S.Ct. 2506, 2520, 105 L.Ed.2d 298 (1989) (hereinafter *NOPSI* ) (explaining ripeness holding of *Prentis* ). Unlike *Prentis,* the New Hampshire Supreme Court does not have such authority under the relevant provisions of RSA 541, as all that Court can do is uphold, suspend, set aside, or vacate an order by the Commission. *See Legislative Util. Consumers' Council v. Public Serv. Co.,* 119 N.H. 332, 402 A.2d 626, 631–32 (1979) (describing limited nature of Court's review authority). Thus, because the New Hampshire Supreme Court's review would not be part of a "unitary and still-to-be-completed legislative process," *NOPSI,* 491 U.S. at 372, 109 S.Ct. at 2520, the ripeness holding of *Prentis* in inapplicable.

Turning to the second prong of the ripeness inquiry, it is clear that plaintiffs will suffer hardship if this Court's jurisdiction is withheld. As an initial matter, plaintiffs have cited threatened injuries that are real and immediate. Indeed, the weight of the evidence presented to this Court suggests that the issuance of the Final Plan on February 28, 1997 threatened PSNH with substantial financial harm. For example, the adoption of a ratemaking methodology that differs from the traditional cost-of-service model would cause PSNH to lose the benefits of FAS 71, so that—absent this litigation—the company would have written-off more than $400 million in regulatory assets in its quarter-end financial statements (the quarter

**20.** Throughout this litigation, the parties have not contested that RSA 541, and not RSA 541–A, provides the applicable review procedures. The Court notes that it would reach the same result on the ripeness issue under either mechanism,

closed on March 31, 1997).[21] The resulting violation of covenants in plaintiffs' credit agreements and the prospect of imminent bankruptcy are injuries that are sufficiently concrete to warrant the exercise of this Court's jurisdiction.

Furthermore, the challenged action does pose a dilemma for PSNH, as the Commission's issuance of the Final Plan compels plaintiffs to choose between, on the one hand, detrimentally changing their behavior in order to comply with a law, and, on the other hand, refusing to comply with the law and thus risking punishment. *See W.R. Grace*, 959 F.2d at 364. Plaintiffs face such a dilemma on the FAS 71 issue, as they cannot ignore the substance of the Commission's actions (i.e., give themselves the benefits of FAS 71 treatment) without risking violation of various SEC financial disclosure requirements. Moreover, PSNH faces another choice: it must either begin to gather the materials needed to make its compliance filings, or ignore the Commission's actions and refuse to make the filings by the date set in the Final Plan. For these reasons, the Court is satisfied that the hardship prong of the ripeness inquiry has been met.

The Court must now address a question that was left open earlier in this discussion: how certain actions taken by the Commission subsequent to the filing of this lawsuit affect the ripeness of plaintiffs' challenge to the Final Plan, if at all. In an order dated March 19, 1997, the Commission granted a request for a rehearing on the propriety of the regional average benchmark approach to ratemaking.[22] In an subsequent scheduling order, the Commission further noted that it might revisit the Final Plan's treatment of the Rate Agreement.[23] Pending this rehearing, scheduled for May 21–22, 1997, the Commission has stayed those portions of the Final Plan that will be addressed at the hearing, as well as the interim stranded cost orders issued contemporaneously with the Final Plan.

■  It is well settled that a court must evaluate the ripeness of the dispute as of the date of decision, and not as of the time the complaint was filed. *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 139–40, 95 S.Ct. 335, 356–57, 42 L.Ed.2d 320 (1974). Due to this time element, in some instances post-filing events will cause a case that was previously ripe for review to become unripe. Thus, the Court must consider whether this litigation, which clearly presented a ripe controversy at the time it was filed, has become unripe in light of the Commission's post-filing decision to rehear certain matters concerning the Final Plan. For the reasons that follow, the Court concludes that the case has not become unripe.

First, and most importantly, the Court notes that only a few of the claims advanced in this litigation concern matters that might be influenced by the rehearing. The rehearing order does not explicitly state the Commission's willingness to reconsider its adoption of the regional average rate benchmark approach. Instead, the rehearing appears to be limited to a re-examination of the relationship between the methodology and two collateral issues—PSNH's FAS 71 dilemma and the effect of the Rate Agreement. Nonetheless, even assuming that the Commission might be willing to reconsider, and ultimately change, the Final Plan's ratemaking methodology at this juncture, this possibility would not affect the majority of the claims at issue here in any respect. As the Commission has explicitly stated, the stay order has no impact whatsoever on those parts of the Final Plan that are not subject to rehearing. Thus, for example, the challenged unbundling, divestiture, open-access, and FERC

and thus it is not necessary to resolve the issue at this time.

**21.** The evidence also supports the view that the Commission's repudiation of the Rate Agreement would suffice to cause PSNH to lose the benefits of FAS 71 treatment.

**22.** *See* Public Utilities Commission, Order No. 22,526 in Docket No. DR 96–150: Order Granting Motion for Rehearing and Stay of a Limited Portion of Order No. 22,512 and Order No. 22,514 (March 19, 1997).

**23.** *See* Public Utilities Commission, Order No. 22,548 in Docket No. DR 96–150: Procedural Order Addressing Motions for Rehearing (April 7, 1997).

tariff-filing requirements continue to stand as the Commission's "final act" on these matters. Accordingly, the claims that implicate these matters, such as plaintiffs' preemption, physical taking, first amendment, and commerce clause claims, remain ripe for adjudication.

Additionally, the Court finds that there continues to be a ripe controversy even as to those claims that are related to the ratemaking methodology of the Final Plan, such as the regulatory confiscation and contracts clause claims. In this Court's view, the issuance of the Final Plan amounted to a conclusive act of legislation or rulemaking by the Commission, and the mere possibility that the Final Plan might be repealed or changed in the future is insufficient to defeat the ripeness of claims related to this legislative action. *See American Petroleum Inst. v. United States E.P.A.*, 906 F.2d 729, 739–40 (D.C.Cir.1990) (If agency's power to revise a final rule "were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely."). Until the Commission takes a further determinative action to conclusively amend or disavow the Final Plan in whole or in part, the Court must view the Final Plan as the Commission's final action on all matters contained therein.

This conclusion is bolstered by the First Circuit's decision in *Riva v. Massachusetts*, 61 F.3d 1003 (1st Cir.1995), which presented an analogous ripeness issue. In *Riva*, the Court noted the possibility that the statute under review might be amended during the course of the lawsuit and thus moot the plaintiff's claim: the challenged retirement statute would not directly affect the plaintiff for some years, and there was a bill pending in the state legislature to repeal the very statute under attack. *See id.* at 1010–11. Nonetheless, the First Circuit found that the case presented a ripe controversy, on the following grounds:

> In all events, a litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted.... [T]he repeal of a statute will always be possible in any case of delayed enforcement, yet it is well settled that time delay, without more,

will not render a claim of statutory invalidity unripe if the application of the statute is otherwise sufficiently probable. The degree of contingency is an important barometer of ripeness in this respect. Here, the relative certainty of [plaintiff's] asserted injury indicates that his claim is suitable for contemporaneous judicial review.

*Id.* at 1011 (citations omitted); *see also Puerto Rico Tel. Co. v. F.C.C.*, 553 F.2d 694, 697 (1st Cir.1977) ("[W]e do not agree with the FCC that its leaving the door open to reconsideration of the [challenged action] on the basis of additional facts showing economic hardship should bar our review.").

As with the statute under review in *Riva*, there is no reason to expect that the Final Plan will look any different after the rehearing process than it does today. Putting aside the limited scope of the rehearing, the Court notes that the Commission had already been presented with all of the arguments concerning the ratemaking methodology at the time it issued the Final Plan. Given the fact that the Commission has previously weighed the arguments that will be presented at the rehearing, and the fact that an overwhelming portion of the Final Plan's Legal Analysis (at least 92 of 132 pages) was devoted to a defense of the Final Plan's ratemaking approach and its treatment of the Rate Agreement, the "degree of contingency" raised at this juncture is minimal. *Compare Riva*, 61 F.3d at 1011 (fact that prior efforts to repeal had failed weighed in favor of ripeness). Therefore, the "theoretical possibility that harm may be averted" is not enough to defeat the ripeness of those claims related to the ratemaking methodology adopted in the Final Plan.

Accordingly, the Court concludes that this case is ripe for adjudication in a federal court, notwithstanding the Commission's recent actions. Therefore, the Court will now turn its attention to the question of whether it would be proper to exercise its jurisdiction over this dispute, or whether the particular circumstances of this case warrant the application of any of the various doctrines of abstention.

## B. Abstention

It is well settled that federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). However, under certain circumstances a federal court can abstain from the exercise of its proper jurisdiction. *See Pustell v. Lynn Pub. Sch.*, 18 F.3d 50, 53 (1st Cir.1994). While the decision to abstain is left to the "sound equitable discretion" of the district court, *Burford v. Sun Oil Co.*, 319 U.S. 315, 318, 63 S.Ct. 1098, 1099, 87 L.Ed. 1424 (1943), a court should not lightly decide to abdicate its authority to hear a case properly within its jurisdiction, as abstention remains "the exception, not the rule." *Colorado River*, 424 U.S. at 813, 96 S.Ct. at 1244. With these principles in mind, the Court will proceed to consider whether abstention is appropriate in this matter.

### 1. Burford Abstention

Under the rule of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), abstention is appropriate when the exercise of federal court jurisdiction risks "turning the federal court into a forum that will effectively decide a host of detailed state regulatory matters, to the point where the presence of the federal court, as a regulatory decision-making center, makes it significantly more difficult for the state to operate its regulatory system." *Bath Mem'l Hosp. v. Maine Health Care Fin. Comm'n*, 853 F.2d 1007, 1012 (1st Cir.1988). Because the resolution of this lawsuit will not transform this Court into "a regulatory decision-making center," *Burford* abstention is inappropriate.

The Supreme Court most recently addressed the contours of *Burford* abstention in *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (hereinafter *NOPSI* ). In *NOPSI*, a local utility challenged a ratemaking body's disallowance of certain costs associated with a nuclear power venture, arguing primarily that the decision was preempted by federal law. *Id.* at 354–58, 109 S.Ct. at 2510–13. After reviewing the *Burford* decision and the line of cases that have developed the doctrine, the Court summarized the rule of *Burford* abstention as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*NOPSI*, 491 U.S. at 361, 109 S.Ct. at 2514 (quoting *Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1244). The Court was able to dispense with the first prong of this analysis in short order, as the case did not pose a state law claim or a federal claim so "entangled in a skein of state law" that state law issues had to be resolved before the federal claims could be addressed. *See NOPSI*, 491 U.S. at 361, 109 S.Ct. at 2514 (internal quotation omitted).

The Court then turned to the second concern of the *Burford* doctrine: protecting state administrative processes from undue federal interference. The Court began by noting that abstention is not required "whenever there exists such a process, or even in all cases where there is a potential for conflict with state regulatory law or policy." *Id.* at 362, 109 S.Ct. at 2515 (internal quotation omitted). The Court then stressed that the nature of the primary claim at bar—a preemption claim—was such that it would not unduly intrude on the state's administrative process:

> no inquiry beyond the four corners of the Council's retail rate order is needed to determine whether it is facially pre-empted by [federal law]. Such an inquiry would not unduly intrude into the processes of state government or undermine the State's ability to maintain desired uniformity.

*Id.* at 363, 109 S.Ct. at 2515. The Court thus distinguished the case before it from cases asserting "that a state agency has misapplied

its lawful authority or has failed to take into consideration or properly weigh relevant state law factors," the federal adjudication of which could "disrupt the State's attempt to ensure uniformity in the treatment of an essentially local problem." *Id.* at 362, 109 S.Ct. at 2515 (internal quotation omitted).

█ This characterization and application of *Burford* abstention guides the decision here. First, the Court must consider whether there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *NOPSI,* 491 U.S. at 361, 109 S.Ct. at 2514. While there is no doubt that the Commission's efforts to restructure the electric utility industry raise matters of critical public importance, abstention is not warranted on this basis alone, because this case does not present any difficult questions of state law. Plaintiffs' complaint asserts exclusively federal statutory and constitutional claims, with the sole exception of a state law takings claim that mirrors the federal constitutional provision. *See Quirk v. Town of New Boston,* 140 N.H. 124, 663 A.2d 1328, 1332–33 (1995) (adopting federal law concepts for takings claim under state Constitution). Moreover, the federal claims are not "in any way entangled in a skein of state law that must be untangled before the federal case can proceed." *McNeese v. Board of Educ.,* 373 U.S. 668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963). While the Commission has argued otherwise, plaintiffs' contracts clause claim can be resolved without deciding difficult state law questions; for contracts clause purposes, the question of whether contractual rights exist and have been unconstitutionally impaired is a matter of federal law. *See General Motors Corp. v. Romein,* 503 U.S. 181, 187, 112 S.Ct. 1105, 1110, 117 L.Ed.2d 328 (1992). Accordingly, "the first avenue to *Burford* abstention is a dead end." *Fragoso v. Lopez,* 991 F.2d 878, 883 (1st Cir.1993).

The Court will now turn to "the second roadway to *Burford* abstention: when federal review will disrupt 'state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Id.* at 883–84 (quoting *NOPSI,* 491 U.S. at 361, 109 S.Ct. at

2514). The First Circuit has recently summarized this part of the inquiry as follows:

In sum, *NOPSI* cabins the operation of the *Burford* doctrine. Post-*NOPSI Burford* applies only in narrowly circumscribed situations where deference to a state's administrative processes for the determination of complex, policy-laden, state-law issues would serve a significant local interest and would render federal court review inappropriate.

*Fragoso,* 991 F.2d at 882.

Further, since *NOPSI* the First Circuit has offered guidance as to the nature of the "narrowly circumscribed situations" to which *Burford* abstention is applicable. In *Trailer Marine Transport Corp. v. Rivera–Vazquez,* 931 F.2d 961 (1st Cir.1991), the Court acknowledged that much of its pre-*NOPSI* jurisprudence on *Burford* followed along the same lines as *NOPSI,* in that the Court had drawn a similar distinction between the types of claims that would or would not unduly intrude on an administrative decision-making process. *Id.* at 963. In *Allstate Insurance Co. v. Sabbagh,* 603 F.2d 228 (1st Cir.1979), while the Court ultimately found that abstention was proper, one factor weighing against abstention was that the plaintiff had challenged the constitutionality of the entire rate schedule, rather than attacking "a state commission's exercise of discretion with respect to a few particular applications of a regulatory scheme." *Id.* at 232. Similarly, in *Bath Mem'l Hosp. v. Maine Health Care Fin. Comm'n,* 853 F.2d 1007 (1st Cir.1988), the Court stressed that the plaintiffs "do not seek individualized review of fact-(or cost-) specific regulatory decision making. To the contrary, they attack the statute as it is written." *Id.* at 1014. In that instance, abstention was inappropriate, as the risks of intrusion on state processes would be "no greater than those present whenever a federal court decides whether a state regulatory statute is constitutional." *Id.* at 1015.

The Court relied on this same distinction in the *Trailer Marine* case. There, plaintiff had brought equal protection and commerce clause challenges to a scheme by which Puerto Rico set a special fee, in lieu of an annual insurance premium, on "temporary trailers"

entering the Commonwealth. *See Trailer Marine,* 931 F.2d at 962.[24] While the plaintiff specifically challenged the amount of the fee assessed, the Court recognized that the challenge focused not so much on the level of the fee but rather on the basis established for setting the fee—"a scheme under which a separate fee is charged each time a temporary trailer enters Puerto Rico, as opposed to some alternative basis more closely related to the use of the roadways on the island." *Id.* at 963.

In determining whether the case fell "within the narrow *Burford* exception to federal courts' obligation to adjudicate claims within their jurisdiction," *id.* at 964, the Court again focused on the nature of plaintiff's claims and the type of review a district court would have to undertake in order to resolve those claims. As in *NOPSI, Sabbagh,* and *Bath Memorial,* the challenge was to the constitutionality of the overall scheme—not to a utility-specific determination—and thus the district court could conduct the required equal protection and commerce clause analyses "without extensive inquiry into the factual basis of the fee structure .... [and] without inquiring beyond the statute and the implementation procedure themselves." *Id.* Because such facial review would not unduly intrude into the state's administrative process, abstention under *Burford* was not warranted. *Id.*

These precedents suggest a clear line of demarcation: on the one hand, cases seeking individualized review of utility-specific regulatory determinations, for which abstention is appropriate; and, on the other hand, cases challenging the constitutionality of an entire state regulatory system, for which abstention under *Burford* is not warranted. Indeed, this distinction makes perfect sense in light of the concern which animates this part of the *Burford* analysis: disruption of a state's

effort to establish a coherent regulatory policy. If each utility were allowed to seek federal court review of firm-specific rate orders, such a "parallel, additional, federal, regulatory review' mechanism" would clearly threaten to disrupt the state's administration of its regulatory scheme by the sheer volume of challenges. *See Bath Memorial,* 853 F.2d at 1013. Moreover, uniformity concerns are also implicated, in that such a parallel review system runs the risk that for the same legal question, one utility could gain a favorable determination in one forum, while a second firm could lose its appeal in the parallel review forum.

However, when a challenge is brought to the legality of an entire state regulatory system, these concerns are not implicated to the same degree. In such cases, uniformity is not an issue, as the constitutionality of the regulatory scheme will be determined in one judicial proceeding, sited in the plaintiff's choice of forum. Moreover, the disruption occurs once—when the challenge is brought.[25] Although federal court review may stall the regulatory process as the challenge is heard, the same level of disruption occurs "whenever one attacks a state law on constitutional grounds in a federal court." *Id.* And while such review may declare the entire regulatory scheme unconstitutional — the ultimate disruption—"there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Zablocki v. Redhail,* 434 U.S. 374, 379–80 n. 5, 98 S.Ct. 673, 677–78 n. 5, 54 L.Ed.2d 618 (1978).

■ In light of this distinction, it is clear that *Burford* abstention would be inappropriate here, because this litigation poses a constitutional challenge to the entirety of

---

24. In order to fund its no-fault auto insurance scheme, Puerto Rico had set a flat-fee premium applicable to all motor vehicles operating on the island. At issue in *Trailer Marine* was a law which established how this premium would be collected from a common carrier that did not maintain trailers in Puerto Rico year-round, but instead brought its own trailers on and off the island with each shipment ("temporary trailers"). *See Trailer Marine,* 931 F.2d at 961–62.

25. Recall that in setting forth the *Burford* rule the Supreme Court expressed concern that "federal review of the question in a case *and in similar cases"* would unduly disrupt the regulatory process. *See NOPSI, 491 U.S. at 361, 109* S.Ct. at 2514 (emphasis added). However, when a one-time challenge is brought to an entire state regulatory system, such a case will provide a final determination on the legality of the challenged scheme. Thus, there will be no "similar cases" to further disrupt the regulatory process.

the Commission's restructuring plan—not to utility-specific regulatory decisionmaking. To resolve plaintiffs' claims, the Court will not need to engage in the type of "detailed factual analysis of the bases of the [Commission's] decision" that would transform this Court into a parallel regulatory review institution. *See Sabbagh*, 603 F.2d at 233. Indeed, this litigation has nothing to do with the Commission's reasons for adopting the market structure and cost-recovery mechanisms presented in the Final Plan, or whether these reasons are supported by an adequate factual basis, or whether an alternative structure would make for sounder public policy. Instead, the Court is asked to consider a different set of questions: as written, what sort of industry structure does the Final Plan create; what cost-recovery mechanisms does the Final Plan provide; what must a utility do to comply with the Final Plan—and does this pass constitutional muster. Where, as here, federal statutory and constitutional questions are squarely presented, and these questions can be resolved without reviewing a regulatory authority's utility-specific decisions, *Burford* abstention is not only unwarranted, but is also wholly inappropriate in light of this Court's "virtually unflagging obligation" to hear claims within its jurisdiction.

A brief review of the complaint reinforces the conclusion that this Court will not be engaging in individualized review of regulatory decisionmaking that would "unnecessarily threaten to impede significantly the ongoing administration of a state regulatory system." *Bath Memorial*, 853 F.2d at 1013. Indeed, most of plaintiffs' claims will not require any inquiry beyond the "four corners" of the Final Plan.[26] For instance, to resolve the preemption claim, as in *NOPSI*, the Court

needs only to discern what it is that a utility must do under the Final Plan as written, and consider whether these requirements conflict with applicable provisions of federal law. *See NOPSI*, 491 U.S. at 362–63, 109 S.Ct. at 2515–16. Similarly, in considering the contracts clause claim, the Court will look at whether any rights or obligations created by the Rate Agreement survive the adoption of the Final Plan.[27] The same mode of analysis applies to plaintiffs' claims under the commerce clause and first amendment: after discerning what the letter of the Final Plan requires and/or prohibits, the Court can then decide whether this offends the Constitution. *See Trailer Marine*, 931 F.2d at 964. (commerce clause challenge to regulatory scheme did not require abstention). For all of these claims, the type of review the Court must undertake is not of a nature to implicate *Burford* concerns.

Plaintiffs' confiscation and takings claims present somewhat closer questions. As the First Circuit has noted, a confiscation claim "is a rather special claim in that it has often required the court to review individual firm costs and related individualized factual circumstances." *Bath Memorial*, 853 F.2d at 1014 (emphasis in original). Because these claims generally require "highly individualized review of particular, firm-specific regulatory decisions," *id.*, abstention is often proper. *See also Alabama Public Serv. Comm'n v. Southern Ry. Co.*, 341 U.S. 341, 347–48, 71 S.Ct. 762, 767–68, 95 L.Ed. 1002 (1951) (confiscation claim essentially required court to second-guess commission's balancing of railroad's interests against interests of the public).

However, the confiscation claims advanced in this case will not require this Court to engage in this sort of firm-specific "second-

---

**26.** The Commission's understanding of what it means to "look beyond the four corners" is misguided. Judicial interpretation of a provision of the Final Plan—i.e., determining what the Final Plan requires—is not an inquiry beyond the "four corners" as the phrase is used in this context. The reference in *NOPSI* to an "inquiry beyond the four corners" of an order refers to a review of the factual bases of a decision, to determine whether the regulators weighed all the relevant factors and reached the proper balance of interests. *See NOPSI*, 491 U.S. at 362–63, 109 S.Ct. at 2515–16. Construction of provisions in a stat-

ute or contract is well within the four corners, and is part and parcel of the judicial function.

**27.** The Commission has suggested that the Court will have to look beyond the "four corners" to determine whether the Rate Agreement constitutes a contract at all. However, because this inquiry does not require a review of the reasonableness and underlying factual basis of a regulatory decision, it is not the type of inquiry that raises *Burford* concerns. *See supra* note 26.

guessing" of a regulatory decision. Much like the *Trailer Marine* case, while PSNH challenges the specific interim stranded cost recovery allowed for the company, the thrust of the case is plaintiffs' challenge to the methodology used throughout the Final Plan to fix interim and final stranded cost charges—the regional average rate benchmark method. *See Trailer Marine*, 931 F.2d at 963. Similarly, plaintiffs' takings claim challenges the notion that a distribution company can be required to grant "open access" to all electricity suppliers, a facial challenge that can be resolved on the "four corners" of the Final Plan, without delving into facts and circumstances particular to PSNH. In other words, because this challenge centers on particular aspects of the restructuring order itself, and not on PSNH-specific regulatory determinations about cost recovery and access, *Burford* abstention is not warranted.

■ The Court does recognize that one of PSNH's claims will require the Court to consider whether there was a sufficient factual basis to support the conclusions reached in the Final Plan. In Count V, plaintiffs assert that their substantive due process rights have been violated in that the Final Plan's cost recovery mechanisms are "fundamentally irrational and unfair." To resolve this claim, the Court will necessarily examine the factual record to determine whether the challenged provisions are rationally related to a legitimate governmental purpose. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 82–84, 98 S.Ct. 2620, 2635–36, 57 L.Ed.2d 595 (1978) (rational basis test governs substantive due process challenges to economic regulation). However, this rational basis review will involve no more second-guessing of the Commission's decision than the limited review needed to resolve the equal protection claim advanced in *Trailer Marine:* no "extensive inquiry into the factual basis" of the restructuring plan is needed to determine if the scheme has a rational basis. *See Trailer Marine*, 931 F.2d at 963–64. As in *Trailer Marine*, such a limited review of the factual record does not require abstention.

Lastly, the Court will respond to the Commission's oft-repeated contention that the

First Circuit's decision in *Sabbagh* controls the decision here. In *Sabbagh*, the Massachusetts Supreme Judicial Court's exclusive and comprehensive review authority over regulatory decisions was deemed "an integral part of the regulatory process," the factor that tilted the balance in favor of abstention. *See Sabbagh*, 603 F.2d at 232–34. The Commission, arguing that the New Hampshire Supreme Court has review authority similar to that in *Sabbagh*, argues that the same reasoning and result should apply here. However, this argument overlooks the crucial distinction between *Sabbagh* and the present case, a distinction that has been emphasized throughout this discussion: *Sabbagh* posed a challenge to a single regulatory decision within an ongoing and lawful regulatory scheme, while this case attacks the regulatory scheme itself. This distinction becomes evident upon a review of the nature of the regulatory scheme and order at issue in the *Sabbagh* case.

*Sabbagh* concerned the regulation of the Massachusetts insurance industry. State law provided that insurance companies would set their own rates; however, the companies were required to submit their rates to the Commissioner of Insurance, who would conduct hearings to determine whether those rates were excessive. *Id.* at 229. If the rates were deemed excessive, the Commissioner was empowered to reject these rates, and then set a rate schedule for the entire industry on the basis of the data available to him. *Id.* Aggrieved parties could seek expedited review of this industry-wide rate order in the Supreme Judicial Court, which had comprehensive authority "to modify, amend, annul, reverse, or affirm such action ... [and] make any appropriate order or decree." *Id.*

The *Sabbagh* case involved an objection to the rates set by the Commissioner for 1979. The plaintiff, who argued that the 1979 rates were confiscatory, chose to bypass the state review procedure and brought the action in federal court. *Id.* at 230. The First Circuit, noting that the case was a close one, found that abstention was appropriate because the case dealt "with an area of intensely local interest, and the state has indicated the im-

portance it places on coherency of its policy by concentrating review of all regulatory decisions in one court." *Id.* at 233. Because this review was an integral part of the regulatory process, federal court intervention would unduly intrude on the state's efforts to operate its regulatory system in a coherent and efficient manner. *Id.* at 233–34.

In light of this background, it is readily apparent that the present case differs significantly from *Sabbagh.* First, federal court intervention in *Sabbagh* would have certainly threatened to disrupt the state's effort to establish a coherent regulatory policy, as a federal suit could follow each time the Commissioner issued an industry-wide order—potentially an annual event. Further, for any given year there could be more than one challenge to the rate schedule, brought by different insurance companies in different fora on different legal theories. *See id.* at 232 n. 4 (noting this possibility). However, the case at bar does not raise such a threat of recurring challenges and inconsistent results, as this case presents a one-time challenge to the constitutionality of the overall scheme.

Moreover, unlike the present case, federal review in *Sabbagh* would have required the district court to second-guess a fact-intensive regulatory decision. While *Sabbagh* presented a challenge to industry-wide rates for a particular year, and not to a firm-specific rate order, those rates were set on the basis of a set of underlying costs and facts specific to that year. *See id.* at 230. Moreover, the plaintiffs were pressing an individualized confiscation claim, based on data for a specific company for a particular year. As the Court recognized, review of the claim "would inevitably involve detailed factual analysis of the bases of the Commissioner's decision," id. at 233, where "the federal question [can be] resolved only after a mass of data is analyzed by methods and on principles that owe nothing more to national than to state government." *Id.* at 232 n. 3. In other words, the federal court in *Sabbagh* would have been required to re-weigh all the factors that went into the Commissioner's rate-setting order, and determine whether the proper balance had been reached—the type of parallel, regu-

latory review that *Burford* counsels federal courts to avoid. Unlike this fact-intensive inquiry, plaintiffs in the present case challenge more broad-based propositions, such as the acceptability of less-than-full cost-recovery under the regional average rate method. In reviewing the constitutionality of the Final Plan's cost-recovery mechanisms, the Court will be considering the entire regulatory scheme on its face, not a particular fact-intensive decision within that scheme. On this basis alone, the two cases are markedly different.

Finally, and most centrally, review by the New Hampshire Supreme Court is not an "integral part" of the regulatory process in New Hampshire, as that phrase was used in *Sabbagh.* As the First Circuit has since noted, *Sabbagh* was an exceptional case, where the reviewing state court "had the power not only to affirm or reverse the [regulatory] order, but also to modify or amend it." *Medical Malpractice Joint Underwriting Ass'n v. Pfeiffer,* 832 F.2d 240, 244 (1st Cir.1987). However, the New Hampshire Supreme Court's authority in this context, governed by N.H.Rev.Stat. Ann. §§ 541:1 to 541:22, is a much less exceptional power of oversight. Far from playing an integral regulatory role, in this arena the New Hampshire Supreme Court serves a more traditional judicial function, as the Court can only uphold or vacate the Commission's decision. Thus, because "the state courts are not a part of the regulatory process and possess no special powers not possessed by the district court to correct any constitutional problems with the [regulatory] order," *Pfeiffer,* 832 F.2d at 244, *Sabbagh* is not controlling.

In sum, resolution of the claims advanced in this case does not require an individualized review of the factual bases of a regulatory decision, the type of parallel, regulatory review with which *Burford* was concerned. Instead, this Court has been asked to review the constitutionality of the state's restructured electric utility industry, and the manner in which that industry will operate—i.e., how utilities must structure themselves, how costs will be recovered, and the like. Because the federal statutory and constitutional questions have been squarely presented, and

because the resolution of these questions does not pose a "threat to the proper administration of a *constitutional* state regulatory system," *Bath Memorial*, 853 F.2d at 1013 (emphasis in original), abstention under the *Burford* doctrine would be inappropriate.

## 2. Pullman Abstention

Under the doctrine enunciated in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a federal court may abstain from deciding a case when state law is uncertain, and a clarification of the law in a pending state court case might make the federal court's constitutional ruling unnecessary. *Id.* at 499–500, 61 S.Ct. at 644–645. By thus affording state courts the opportunity to resolve difficult state law issues that might be dispositive in the case at bar, the *Pullman* doctrine "serves the dual aims of avoiding advisory constitutional decisionmaking, as well as promoting the principles of comity and federalism by avoiding needless federal intervention into local affairs." *Pustell v. Lynn Pub. Sch.*, 18 F.3d 50, 53 (1st Cir.1994).

▮ This is clearly not a case for *Pullman* abstention, as there are no state law issues implicated here, let alone any state law issues that are unresolved or unclear. As was discussed earlier, this case poses federal statutory and constitutional challenges to the Final Plan for restructuring. First, neither party has suggested a state law claim that could potentially obviate the need for a federal constitutional decision. *See id.* at 53–54 (abstention warranted because state law basis. found to vindicate constitutional claims). The mere fact that plaintiffs have asserted a state law takings claim is of no moment, as abstention is not required to allow state courts to measure state actions against state constitutional protections that mirror federal constitutional provisions. *See Guiney v. Roache*, 833 F.2d 1079, 1082–83 (1st Cir. 1987), *cert. denied*, 493 U.S. 963, 110 S.Ct. 404, 107 L.Ed.2d 370 (1989). Moreover, the Court is unaware of underlying state law issues that need to be untangled before the federal claims can be resolved. In such cases, "[w]hen the federal claim is not entangled with complicated unresolved state law questions, abstention is inappropriate." *Rivera–Puig v. Garcia–Rosario*, 983 F.2d 311, 322 (1st Cir.1992).

▮ In addition, the Commission has not identified any pending state judicial proceeding that might resolve underlying state law issues and thus raise *Pullman* considerations. Perhaps realizing this deficiency, the Commission at this point revisits its ripeness argument, and again offers that review of the Final Plan is available in the New Hampshire Supreme Court. However, the Commission has not suggested any grounds for decision apart from the federal grounds asserted in this case. Although the New Hampshire Supreme Court could ultimately pass on the same federal questions that have been asserted here, "[a] federal court should not abstain simply to give a state court the first opportunity to vindicate federal rights." *Rivera–Puig*, 983 F.2d at 322. Therefore, *Pullman* abstention is not warranted.

## 3. Younger Abstention

In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that absent extraordinary circumstances, federal courts should not enjoin state criminal prosecutions pending against the federal plaintiff. *Id.* at 43–45, 91 S.Ct. at 750–751. This holding rested primarily on the notion of federal-state "comity"—

> a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Id.* at 44, 91 S.Ct. at 750. Since *Younger*, this deference to state institutions has been extended to ongoing civil and administrative proceedings, as long as the proceedings: (1) are judicial in nature (as opposed to legislative); (2) implicate important state interests; and, (3) afford the federal plaintiff adequate opportunity to raise federal constitutional

claims and defenses. *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982).

▮ The Commission argues that its proceedings to restructure the electric utility industry merit *Younger* treatment. However, this contention is clearly meritless. Even assuming that important state interests are implicated and that the ability to appeal regulatory orders to the New Hampshire Supreme Court affords PSNH an adequate opportunity to raise federal issues, it is beyond doubt that the Commission's proceedings in the present case are not judicial in nature. In *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908), Justice Holmes drew the following distinction between judicial inquiries and legislative acts:

> A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.

*Id.* at 226, 29 S.Ct. at 69. The Court in *Prentis* then applied this definition to conclude that ratemaking was a legislative act, *id.,* a conclusion that has been reaffirmed by the Supreme Court on a number of occasions. *See NOPSI,* 491 U.S. at 371, 109 S.Ct. at 2520 ("We have since reaffirmed both the general mode of analysis of *Prentis* and its specific holding that ratemaking is an essentially legislative act." (citations omitted)).

From this definition, it is clear that the Commission's proceedings are plainly legislative in kind. The Court agrees with the Commission that the specific holdings of *Prentis* and *NOPSI* are not directly applicable, as the proceedings at issue here are not "garden-variety" ratemaking—in fact, to date no rates have been set under the Final Plan, although such rate-setting is soon to follow.

However, by engaging in its ongoing process to adopt and implement a plan to restructure an entire industry, the Commission clearly "looks to the future and changes existing conditions" in the state's electric utility industry, the essence of legislation. *See Prentis,* 211 U.S. at 226, 29 S.Ct. at 69. The Supreme Court has never extended the *Younger* doctrine to proceedings that are not "judicial in nature," *see NOPSI,* 491 U.S. at 370, 109 S.Ct. at 2519, and neither will this Court. Therefore, this case is not a proper candidate for *Younger* abstention.

### 4. Additional Considerations

In their briefs, the *amici* have raised a number of grounds for abstention that were not raised by the Commission. Subject to one important exception discussed below, abstention is not warranted under any of these theories.[28]

First, a few of the *amici* have suggested that the intent underlying the Johnson Act, 28 U.S.C. § 1342, is persuasive evidence that this dispute should not be resolved by a federal court. The Johnson Act provides as follows:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a ratemaking body of a State political subdivision, where:
>
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
>
> (2) The order does not interfere with interstate commerce; and,
>
> (3) The order has been made after reasonable notice and hearing; and,
>
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342.

▮ As most of the *amici* recognize, it does not seem that all four factors of the

---

**28.** The Court finds it unnecessary to address all of the additional arguments advanced by the *amici,* as many of these are plainly without merit or irrelevant at this time. For instance, one party's thorough presentation of an alternative ratemaking methodology is wholly irrelevant to the question of whether abstention is proper. In addition, this is not the time to address whether plaintiffs' 42 U.S.C. § 1983 should be dismissed under the doctrine of official immunity, as this contention has nothing to do with whether this Court should abstain from the exercise of its proper jurisdiction over this controversy.

Johnson Act test can be met in this case. First, plaintiffs' complaint raises federal preemption claims; thus, jurisdiction is based on the allegedly preempted federal statutes, not solely on repugnance to the federal Constitution. *See, e.g., Freehold Cogeneration Assocs. v. Board of Regulatory Comm'rs*, 44 F.3d 1178, 1185–87 & n. 5 (3d Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 68, 133 L.Ed.2d 29 (1995) (collecting cases finding federal preemption claims not barred by Johnson Act). Moreover, the Final Plan clearly implicates interstate commerce, for example, by its requirement that in-state distribution utilities sever their ties with out-of-state generation affiliates. Therefore, the Johnson Act does not divest this Court of its jurisdiction to hear plaintiffs' challenge to the Final Plan.

While acknowledging this conclusion, the *amici* properly note that the Johnson Act evidences a strong congressional intent to prevent federal court interference with the states' own control of their public utility rates. *See Tennyson v. Gas Serv. Co.*, 506 F.2d 1135, 1137–39 (10th Cir.1974). Thus, the *amici* argue that this congressional desire should be factored into the Court's calculus on the abstention question, and perhaps tip the balance in favor of abstention in this case.

The Court does not agree. While recognizing that Congress has expressed its desire to keep federal courts out of state ratemaking issues, the Court submits that the interest is no stronger in this case than in *NOPSI*, where the Supreme Court ultimately concluded that abstention was not warranted. *See NOPSI*, 491 U.S. at 365–66, 109 S.Ct. at 2516–17 (discussing state's interests). In fact, the regulatory order at issue in this case is much broader in nature than that in *NOPSI*, and goes well beyond what Congress likely had in mind in enacting the Johnson Act. The Commission's Final Plan does much more than affect intrastate electric rates; among other matters, the Plan requires corporate restructurings and compels interstate divestment of assets and corporate affiliations. In short, the Final Plan changes the face of the entire electric utility industry in the State of New Hampshire, and is certain

to have an impact beyond the State's borders. Because of the far-reaching nature of the regulatory action challenged in this case, the spirit of the Johnson Act would not be offended by adjudication in a federal forum.

It has also been argued that the so-called *Colorado River* factors weigh in favor of abstention. Under the doctrine that has emerged in the wake of *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), a federal court may abstain under "exceptional circumstances" that raise concerns of judicial administration and economy. *Id.* at 817, 96 S.Ct. at 1246. A number of factors guide a Court's determination of whether such exceptional circumstances exist: (1) whether another forum has assumed jurisdiction over a res; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law controls; (6) whether the state forum will adequately protect the interest of the parties; and (7) whether the federal litigation is contrived or vexatious. *See Rivera–Puig v. Garcia–Rosario*, 983 F.2d 311, 320–21 (1st Cir.1992).

■ As an initial matter, the present case is an odd candidate for *Colorado River* abstention. While the doctrinal concern for the prudent use of judicial resources is generally raised by the pendency of a concurrent state judicial proceeding, *see Colorado River*, 424 U.S. at 818, 96 S.Ct. at 1246, there is no such parallel state court proceeding in this instance. Even so, in balancing the *Colorado River* factors the Court concludes that they would not weigh in favor of abstention in this case. Without running down these factors in a checklist manner, it is sufficient to note that this case presents exclusively federal claims that are in no way contrived, that federal law will control the outcome, and that this Court will be able to serve as a single forum for the adjudication of all of plaintiffs' claims.

However, the basic principle underlying the *Colorado River* abstention doctrine does counsel in favor of abstention as to a limited group of issues in this case. In *Colorado River*, the Court premised its "exceptional

circumstances" abstention test on "considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246 (internal quotation omitted). This concern for judicial economy has found expression in the various factors used in the *Colorado River* analysis. *See id.* at 818–19, 96 S.Ct. at 1246–47; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 23–26, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983) (adding two additional factors to *Colorado River* analysis). This list of factors is not exhaustive, however, and the particular facts and circumstances of a case may suggest concerns for judicial economy beyond those reflected by the enumerated factors. *See Burns v. Watler*, 931 F.2d 140, 146 (1st Cir.1991).

This Court believes that the current posture of this dispute presents such an "exceptional circumstance." As noted earlier, the Commission has scheduled a rehearing on issues related to the Final Plan's approach to ratemaking and its treatment of the Rate Agreement. This rehearing is scheduled for May 21–22, 1997, and the Court expects the Commission to issue a decision of some sort soon thereafter. While the Court has concluded that this post-filing development does not affect the ripeness of this litigation, the Commission's action does raise concerns for judicial economy, such that the Court will "stay its hand" on a limited range of issues for a short period of time. The notion of wise judicial administration dictates that the Court should offer the Commission one last chance to hash out its differences with PSNH regarding the ratemaking methodology and the effect of the Rate Agreement, before the Court itself undertakes a review of these issues. No matter how bleak the prospect of resolution might seem, the Court should at least afford the parties this final opportunity.

It must be understood that the Court is abstaining from consideration of a limited group of matters—those relating to the ratemaking methodology and the Rate Agreement. *See Bath Mem'l Hosp. v. Maine Health Care Fin. Comm'n*, 853 F.2d at 1007, 1015 (1st Cir.1988) (noting district court can abstain as to particular parts of a case). Because the claims alleging violation of the bankruptcy court injunction, impairment of contract, and regulatory confiscation (Counts VIII, IX, and XI) seem especially bound-up in these matters, the Court will postpone consideration of these claims until after the Commission has completed the rehearing process. However, as to the balance of plaintiffs' claims, similar concerns for judicial economy are not raised, as the rehearing will not address any other aspect of the Final Plan that has been challenged in this lawsuit.[29] Thus, as a legal matter, the Court is fully prepared to proceed in its consideration of the balance of the complaint at this time.

As a practical matter, however, the Court will most likely not be available to conduct any further hearings on this matter until after the Commission has completed its rehearing process. The Court has a full dance card of litigation scheduled for the next two months, and thus the earliest the Court could hear a motion for preliminary injunction in this case would be mid- to late-June, 1997. Hopefully, by this time the commission will have completed its work on the rehearing issues and will have advised the Court of its decision on those matters, so that the preliminary injunction hearing can encompass all issued raised in the complaint. Working within this timetable, the Court should be able to address all of the claims in this case in a single evidentiary hearing, and thus avoid resolving this dispute in a piecemeal fashion.

However, the Commission should not read this decision to provide it with a tactical opportunity, as the Court will not allow unnecessary or unreasonable delays in the rehearing process to forestall the Court's consideration of those issues on which it is prepared to proceed. The Court's decision to delay consideration is necessarily one of limited duration. Absent this Court's order,

---

**29.** While the preemption, due process, and takings claims of Counts IV and V raise rate issues tangentially, these claims raise challenges to other fundamental cost-recovery aspects of the Final Plan, unrelated to the ratemaking methodology used. Thus, the Court does not see a need to delay its consideration of these claims at this time.

plaintiffs would face a June 30, 1997 compliance filing deadline under the Final Plan. Furthermore, the January 1, 1998 target date for the onset of competition remains firm and is fast-approaching. In light of these deadlines, PSNH, as well as PSNH's competitors in the electric utility industry, would be expected to begin their preparations for the transition to competition in the coming months. Clearly, any lingering uncertainties about the ratemaking methodology or other aspects of the Final Plan would add an additional and unneeded layer of complexity to a utility's calculations in making these preparations, a situation that this Court will not tolerate.

Of course, the Court fully expects the Commission to issue an order of some kind soon after the hearing, and thus the Court should be in a position to address the entire case in a prompt and efficient manner at that time. However, as the administrative deadlines approach, concerns for prudent judicial administration can be outweighed by a competing concern: that utilities are not compelled to begin a costly transitional process at a time when a key aspect of the regulatory landscape—as well as the legal validity of this entire landscape—remains unclear. While any wasted resources would be absorbed by the utilities in the first instance, ultimately the costs will be passed on to consumers. Therefore, a prompt and efficient resolution of these matters is in the best interests of all interested parties.

## III. Conclusion

For all of these reasons, the Court concludes that this litigation can properly proceed in this forum. The Commission's Final Plan for restructuring has the effect of a legislative act, as it conclusively sets forth how the state's electric utility industry will be structured, and how utilities in the market must operate, as of January 1, 1998. The legislative process of restructuring the industry is now complete, and thus the case is ripe for adjudication. Further, because the Court's review will occasion no greater interference with New Hampshire's regulatory, legislative, or judicial processes than whenever a federal court considers the constitutionality of a state statute, abstention is not warranted, subject to the limited exception outlined herein. Because this case squarely raises a number of federal statutory and constitutional challenges to the Final Plan, and because the Court can find no principled reason to abdicate its authority to hear claims properly within its jurisdiction, it is bound by an "unflagging obligation" to resolve the present dispute.

Accordingly, the Court must in due course proceed to a consideration of the merits of plaintiffs' claims. The Clerk will set the matter down for a hearing on preliminary injunction in mid- to late-June, 1997. Hopefully, by this time the Commission will have completed its work on the rehearing issues and will have advised the Court of its decision, so that the preliminary injunction hearing can encompass all issued raised in the complaint. In addition, the Court expects to issue its decision on the pending motions to intervene some time before the date of this hearing, so as to afford all those with full-party status adequate time to prepare for the presentation of their evidence and arguments at the hearing.

In the interim, the Court's Amended Restraining Order, dated March 21, 1997, shall remain in full force and effect, pending further order of this Court.

It is so ordered.

