USCA1 Opinion

 

 August 21, 1995 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 95-1066 ALBERT RIVA, ET AL., Plaintiffs, Appellants, v. COMMONWEALTH OF MASSACHUSETTS, ET AL., Defendants, Appellees. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this court issued on August 4, 1995, is corrected as follows: 1. On page 2, line 15 delete "vacate" and replace with "reverse". UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1066 ALBERT RIVA, ET AL., Plaintiffs, Appellants, v. COMMONWEALTH OF MASSACHUSETTS, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ _________________________ Before Selya, Boudin, and Lynch, Circuit Judges. ______________ _________________________ Raymond C. Fay, with whom Bell, Boyd & Lloyd, Harold L. _______________ ___________________ _________ Lichten, Bryan Decker and Angoff, Goldman, Manning, Pyle, Wanger _______ ____________ ______________________________________ & Hiatt, P.C., were on brief, for appellants. ______________ Cathy Ventrell-Monsees and Laurie A. McCann on brief for _______________________ _________________ American Association of Retired Persons, amicus curiae. James R. Neely, Jr., Deputy General Counsel, Gwendolyn Young ___________________ _______________ Reams, Associate General Counsel, Vincent J. Blackwood, Assistant _____ ____________________ General Counsel, and Paul D. Ramshaw, Attorney, on brief for U.S. _______________ Equal Employment Opportunity Commission, amicus curiae. Thomas O. Bean, Assistant Attorney General, with whom Scott ______________ _____ Harshbarger, Attorney General, was on brief, for appellees. ___________ _________________________ August 4, 1995 _________________________ SELYA, Circuit Judge. This case, in which three SELYA, Circuit Judge. ______________ plaintiffs seek a declaration that the Massachusetts accidental disability retirement scheme violates the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621-634 (1988), as amended by the Older Workers Benefit Protection Act (OWBPA), Pub. L. No. 101-433, 104 Stat. 978, presents two questions for review on appeal: a question of first impression as to the operation of the OWBPA's nonretroactivity provision; and a situation-specific question concerning justiciability. The district court resolved both of these questions in the defendants' favor. It entered summary judgment against a pair of plaintiffs, determining that the OWBPA did not apply to their claims, and simultaneously dismissed the third plaintiff's claim as unripe. See Riva v. ___ ____ Commonwealth of Mass., 871 F. Supp. 1511, 1517-20 (D. Mass. ______________________ 1994). We affirm the summary judgment ruling, but reverse the dismissal of the remaining plaintiff's claim and remand for further proceedings. I. I. _ The OWBPA The OWBPA Congress enacted the ADEA in 1967 to prohibit age-based discrimination in the "terms, conditions, or privileges" of employment. 29 U.S.C. 623(a). The law originally contained an exclusion for employee benefit plans, providing that an employer could continue to "observe the terms of . . . any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade [ADEA's] purposes." Id. ___ 3 623(f)(2). The Department of Labor, and, later, the Equal Employment Opportunity Commission (EEOC), interpreted this provision to require that age-based distinctions in benefit plans be cost-justified in order to qualify for the shelter of the exclusion. See 29 C.F.R. 1625.10 (1988). When confronted with ___ the issue, the Supreme Court expanded the safe haven. It held that, under the ADEA, an employee challenging a benefit plan must prove that "the discriminatory plan provision actually was intended to serve the purpose of discriminating in some non- fringe-benefit aspect of the employment relation." Public ______ Employees Ret. Sys. v. Betts, 492 U.S. 158, 181 (1989). ___________________ _____ On October 16, 1990, Congress enacted the OWBPA and thus reconfigured the exclusion. The amendments placed employee benefits squarely within the protective custody of the ADEA, overturned Betts, and reinstated the earlier view that age-based _____ distinctions in employee benefits must be cost-justified. Recognizing the potential implications of these changes for public employers, Congress stipulated that the OWBPA would not take effect as to states and their political subdivisions until two years after its passage. See OWBPA 105(c). Moreover, in ___ grappling with the question of retroactivity, Congress decreed that the OWBPA would not apply at all to "a series of benefit payments made to an individual or the individual's representative that began prior to the effective date and that continue after the effective date pursuant to an arrangement that was in effect on the effective date . . . . " Id. 105(e). ___ 4 II. II. __ The Commonwealth's Disability Retirement Scheme The Commonwealth's Disability Retirement Scheme In Massachusetts, public employees who are injured on the job and cannot continue working may retire and receive accidental disability benefits. See Mass. Gen. L. ch. 32, 7 (1989). Ordinarily, the amount of an employee's benefits will equal roughly 72% of her previous wages. See id. 7(2)(a)(ii). ___ ___ But there is a rub: section 7(2)(b ), added in 1987, affords significantly different treatment for employees who have less than ten years of creditable service and who are at least 55 years old at the time of accidental disability retirement. Under section 7(2)(b ), an employee who fits this description receives her regular disability retirement benefits until she turns 65, but her benefits are then refigured to equal the amount she would have received if she retired on superannuation, i.e., if she ____ retired based on age and years of service.1  ____________________ 1As amended, the statute provides in relevant part: The normal yearly amount of the allowance of any member retired under the provisions of this section . . . who at the time of such retirement had attained the age of fifty-five and who at the time of such retirement had accrued fewer than ten years of creditable service shall be adjusted on the last day of the month in which he attains the age of sixty-five to that to which he would be entitled . . . if he were to be retired for superannuation upon the attainment of age sixty-five . . . .  Mass. Gen. L. ch. 32, 7(2)(b ) (1989). 5 III. III. ___ The Plaintiffs The Plaintiffs Albert Riva commenced his employment with the City of Boston in August of 1982. He retired in April of 1992 after experiencing a permanently disabling injury. At the time of his retirement, Riva had not yet accrued ten years of creditable service. On August 19, 1992, the Boston Retirement Board (BRB) transmitted a letter advising him that his benefits were subject to reduction under section 7(2)(b ). Approximately one year later, after Riva had celebrated his sixty-fifth birthday, the Board implemented the law and reduced Riva's benefits from approximately $2,130 per month to approximately $775 per month. Nancy Pentland was employed by the Town of Andover from February of 1981 until she retired due to a job-related disability on November 30, 1988. At the time of her retirement, she was 61 years old but had not yet accrued ten years of creditable service. As of October 31, 1992, the Andover Retirement Board (ARB) recalculated her benefits according to the superannuation guidelines, resulting in a substantial downsizing of her monthly stipend.  Robert Keenan toiled as a Boston school custodian from December of 1989 until March of 1991. At the age of 56, having less than ten years of creditable service, he retired on accidental disability and began receiving a monthly allowance effective February 20, 1993. On June 22, 1994, the BRB notified him of the prospective applicability of section 7(2)(b ) to his 6 case. Keenan was born on August 10, 1937, so his monthly benefit is not scheduled to be recalculated until the year 2002. Nonetheless, subscribing to the adage that an ounce of prevention is sometimes worth a pound of cure, he (like Riva and Pentland before him) filed a charge of discrimination with the EEOC. It is significant that, when the OWBPA took effect, both Riva and Pentland were already receiving disability retirement benefits, but Keenan whose retirement postdated the statute's effective date was not. IV. IV. __ The Litigation The Litigation Riva and Pentland commenced the instant action against, inter alia, the Commonwealth of Massachusetts, the Public _____ ____ Employee Retirement Administration, the BRB, and the ARB (collectively, "the Commonwealth"). Their complaint sought declaratory, injunctive, and compensatory relief, alleging that the Massachusetts accidental disability retirement scheme violated the OWBPA because it arbitrarily reduced retirement benefits based on the recipient's age.2 Keenan subsequently joined the suit as an additional plaintiff. The parties cross-moved for summary judgment on stipulated facts. The district court granted brevis disposition ______ in the Commonwealth's favor vis-a-vis Riva and Pentland, and _________  ____________________ 2The complaint also included two claims for relief under state anti-discrimination laws. Both of these claims were dismissed on the plaintiffs' motion, and have no bearing on this appeal. 7 dismissed Keenan's claim as unripe. See Riva, 871 F. Supp. at ___ ____ 1517-20. The court ruled that even though Riva's and Pentland's benefits were recalculated after the effective date of the OWBPA (when they reached age 65), the smaller payments were of the same class as the original payments, were part of a single series of benefit payments that straddled the effective date, and were paid pursuant to a preexisting arrangement. See id. at 1519. Hence, ___ ___ section 105(e) applied, and the Massachusetts disability retirement scheme, as it affected those plaintiffs, eluded the OWBPA's grasp. See id. ___ ___ Keenan's case easily vaults this hurdle. Unlike Riva and Pentland, he began receiving benefit payments only after the OWBPA had become fully effective. Thus, his claim does not fit within the confines of section 105(e). In the trial court's view, however, a different obstacle loomed. Because Keenan's benefits were not scheduled to be pared for several years, Keenan's alleged injury was both remote and contingent, and, accordingly, his claim was unripe. See id. at 1517-18. All ___ ___ three plaintiffs now appeal. V. V. _ Standard of Review Standard of Review A district court's resolution of a question of statutory interpretation engenders de novo review in the court of appeals. See Pritzker v. Yari, 42 F.3d 53, 65 (1st Cir. 1994), ___ ________ ____ cert. denied, 115 S. Ct. 1959 (1995); United States v. Gifford, _____ ______ _____________ _______ 17 F.3d 462, 472 (1st Cir. 1994). This standard of review 8 applies to the district court's application of section 105(e) to the facts stipulated in the instant case. By the same token, a trial court's determination on a paper record that the case before it lacks ripeness presents a question of law subject to plenary review. See Ernst & Young v. Depositors Economic ___ _______________ ____________________ Protection Corp., 45 F.3d 530, 534 (1st Cir. 1995); Shea v. Rev- ________________ ____ ____ Lyn Contracting Co., 868 F.2d 515, 517 (1st Cir. 1989). ___________________ VI. VI. __ The Exemption The Exemption Both Riva and Pentland began receiving disability retirement benefits prior to the effective date of the OWBPA, and their benefits were reduced pursuant to section 7(2)(b ) after the effective date. For the reasons that follow, we think that the payment stream is exempt from scrutiny under the federal statute.3 We start with a prosaic precept: "In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." Estate of Cowart v. _________________ Nicklos Drilling Co., 112 S. Ct. 2589, 2594 (1992). In other _____________________ words, the court need not consult legislative history and other aids to statutory construction when the words of the statute  ____________________ 3Since Riva and Pentland are similarly situated in respect to the question before us, we opt for simplicity and discuss only Pentland's claim. Our reasoning and result, however, apply equally to Riva. 9 neither create an ambiguity nor lead to an unreasonable interpretation. See United States v. Charles George Trucking ___ _____________ ________________________ Co., 823 F.2d 685, 688 (1st Cir. 1987). In searching a statute's ___ text for a pellucid expression of congressional intent, we attribute to words that are not defined in the statute itself their ordinary usage, see Baez v. INS, 41 F.3d 19, 24 (1st Cir. ___ ____ ___ 1994), cert. denied, 63 U.S.L.W. 3900 (U.S. June 26, 1995) (No. _____ ______ 94-1462), and make a commonsense concession that meaning can only be ascribed to statutory language if that language is taken in context, see King v. St. Vincent's Hosp., 502 U.S. 215, 221 ___ ____ ____________________ (1991). Applying these tenets, we find that section 105(e) unambiguously excludes Pentland's benefits from the application of the OWBPA. As previously noted, Congress exempted from the OWBPA's grasp any "series of benefit payments . . . that began prior to [OWBPA's] effective date and that continue after the effective date pursuant to an arrangement that was in effect on the effective date . . . . " OWBPA 105(e). A "series" is routinely defined as "a group of usu[ally] three or more things or events standing or succeeding in order and having a like relationship to each other." Webster's Third New International __________________________________ Dictionary 2073 (1986); accord Webster's Ninth New Collegiate __________ ______ ________________________________ Dictionary 1074 (1989) (defining series to include "a number of __________ things or events of the same class coming one after another in spatial or temporal succession"); The Random House Dictionary of ______________________________ the English Language 1748 (2d ed. 1987) (defining series to _____________________ 10 include "a group or a number of related or similar things, events, etc., arranged or occurring in temporal, spatial, or other order or succession").4 Consistent with these definitions, all the benefit payments to Pentland form a single "series" as that word is used in section 105(e). The like relationship of the payments is readily apparent. The disbursements, both before and after the recalculation, form a continuing stream of monthly payments, made on account of the same disability, and determined at the time of inception under the same statutory scheme. What is more, the ARB began to pay these serial benefits before the OWBPA's effective date, continued to pay them afterwards, and did so pursuant to an arrangement the payment scheme established in the Massachusetts statute that was in full flower when the OWBPA took effect. To be sure, the size of Pentland's monthly check diminished when she turned 65, but her argument that the reduced benefits comprise a new "series" because her payments were then recalculated on the basis of the superannuation tables is belied by the text of the Massachusetts statute. It directs that an affected individual's benefits shall be adjusted "to that to which [s]he would be entitled under the [statutory scheme] if [s]he were to be retired for superannuation." Mass. Gen. L. ch. 32, 7(2)(b ). This language makes it transpicuously clear that Pentland has continuously received the same kind of benefits   ____________________ 4Courts are free to use standard dictionary definitions to assist in determining the ordinary meaning of statutory language. See, e.g., FDIC v. Meyer, 114 S. Ct. 996, 1001 (1994). ___ ____ ____ _____ 11 accidental disability retirement benefits both before and after the OWBPA's effective date. Only the amount of the monthly stipend, not the nature of the payments, changed when she attained age 65. At the expense of carting coals to Newcastle, we add that appellants' interpretation of a "series" as comprising, for all intents and purposes, a "sequence of identical items," is profoundly flawed. To read section 105(e) in this way would be totally at odds with ordinary usage and, moreover, would lead to absurd results. Carried to its logical extreme, such a reading would gut the exemption by rendering it inapplicable to any stream of benefits that changed after the OWBPA's effective date by reference to an external source. Thus, even the most commonplace adjustments (such as cost-of-living increases) would serve to defeat the exemption. We cannot conceive of any reason why Congress which patently believed that employers should have a substantial degree of protection against the application of a new rule to payment protocols already in use to sustain existing payment schemes would have desired to take so quixotic a position. Section 105(e)'s reference to a preexisting "arrangement" is equally unhelpful to Pentland's quest. Both section 7(2)(b ) and the relevant superannuation guidelines were in existence at the time that the ARB started paying Pentland's retirement benefits, and the parties have not directed our attention to any subsequent changes in either provision which 12 might support a finding that the Commonwealth put a fresh "arrangement" into effect. In Pentland's case, therefore, the entire stream of benefit payments has been (and will be) made pursuant to a single arrangement that was crafted in whole prior to the OWBPA's effective date. Consequently, section 105(e) applies unreservedly. Although the plain language of section 105(e) carries the day and obviates any need for a detailed examination of extrinsic sources, we note in passing that the legislative history of the OWBPA strongly suggests that Congress intended precisely the result that follows from a straightforward rendering of section 105(e)'s plain language. The original draft of the bill, submitted to the Senate on September 17, 1990, contemplated that the OWBPA provisions on which Pentland relies would apply retrospectively. See 136 Cong. Rec. S13, 237 (daily ___ ed. Sept. 17, 1990). This approach provoked stout opposition, and section 105(e) emerged as a compromise. See 136 Cong. Rec. ___ S13,603 (daily ed. Sept. 24, 1990). In responding to a question about the truncated version of the nonretroactivity clause, Senator Pryor, chairman of the Special Committee on Aging and a prime sponsor of the legislation, indicated that the drafters intended, through the compromise, to ensure that the OWBPA would reach benefits that were discriminatorily structured after the applicable effective date, leaving other benefits unaffected. See id. at S13,609. Senator Metzenbaum, whose original bill, as ___ ___ we have said, featured broad retroactivity, concurred in this 13 interpretation of the compromise language.5 So did another key supporter, Senator Hatch.6 In sum, it appears virtually certain that Congress did not intend the OWBPA to apply to benefit payments, like Pentland's, which were structured and commenced prior to the effective date of the neoteric legislation. The comments relied on by the appellants in urging an opposite view mainly statements by legislators who expressed their desire to avoid "disruptions" in ongoing benefits, such as the remarks of Senator Hatch, quoted supra note 6 are more plausibly read as wishing _____ to avoid displacements that would be caused by wide-ranging  ____________________ 5Senator Metzenbaum stated: We also clarify the effective date as it relates to a stream of benefit payments made to an individual that began prior to the effective date. We exempt such a benefit stream from the requirements of the bill, provided that the employer has not initiated the stream pursuant to a modification made after the date of enactment, with the intent to evade the purposes of the bill. 136 Cong. Rec. S13,598 (daily ed. Sept. 24, 1990). 6Senator Hatch voiced his concern that, under the original version, "all the new requirements would be applied to ongoing benefit payments that began before the bill's effective date." 136 Cong. Rec. S13,600 (daily ed. Sept. 24, 1990). Because he feared this result, Senator Hatch concluded that "it was critical to amend the bill to remove the possibility that current recipients of [disability, severance and retirement] benefits could suffer disruptions in their payments." Id. He assured his ___ fellow solons that "[t]he compromise" embodied in the final version of the bill ensured "that ongoing benefit payments to individuals that began prior to the effective date of the bill will not be affected by this legislation." Id.; see also id. at ___ ___ ____ ___ S13,607 (similar; statement of Sen. Grassley). 14 retroactive application of the OWBPA rather than as guaranteeing level benefit rates, regardless of the circumstances, or as disfavoring changes in benefits compelled by the unamended operation of preexisting retirement schemes. We have exhausted this issue. To conclude, we hold that a stream of benefits does not become a new "series" in the contemplation of OWBPA 105(e) simply because the monthly benefit amount is adjusted by reference to an external source pursuant to a directive contained in a preexisting arrangement. Riva and Pentland are, therefore, fishing in an empty pond. VII. VII. ___ The Ripeness Paradigm The Ripeness Paradigm _____________________ We turn now to the more vexing of the two issues presented in this appeal. Since section 7(2)(b ) will not directly affect Keenan's stipend until the year 2002, the district court determined that his claim lacked the ripeness necessary to confer justiciability. See Riva, 871 F. Supp. at ___ ____ 1517-18. Before evaluating this determination, we scout the legal landscape.  When a litigant seeks relief that is primarily prospective in character, questions of ripeness are analyzed under a familiar framework that considers the fitness of the issue for immediate review and the hardship to the litigant should review be postponed. See Abbott Labs v. Gardner, 387 U.S. ___ ___________ _______ 136, 148-49 (1967); Ernst & Young, 45 F.3d at 535. The fitness _____________ branch of the paradigm "typically involves subsidiary queries 15 concerning finality, definiteness, and the extent to which resolution of the challenge depends on facts that may not yet be sufficiently developed." Ernst & Young, 45 F.3d at 535. One _____ _____ critical component is whether "the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." Massachusetts Ass'n of Afro-Am. Police, Inc. v. _____________________________________________ Boston Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992) (per _____________________ curiam). A second important factor in the fitness calculus is the extent to which the claim is bound up in the facts. Courts are more likely to find a claim ripe if it is of an intrinsically legal nature, see, e.g., Pacific Gas & Elec. Co. v. State Energy ___ ____ ________________________ ____________ Resources Conserv. & Dev. Comm'n, 461 U.S. 190, 201 (1983), and _________________________________ less likely to do so if the absence of a concrete factual situation seriously inhibits the weighing of competing interests, see, e.g., California Bankers Ass'n v. Shultz, 416 U.S. 21, 56 ___ ____ ________________________ ______ (1974). A third salient factor that enters into the assessment of fitness involves the presence or absence of adverseness. See ___ State of R.I. v. Narragansett Indian Tribe, 19 F.3d 685, 692-93 _____________ _________________________ (1st Cir.), cert. denied, 115 S. Ct. 298 (1994). In the context _____ ______ of prospective relief, this factor focuses on whether "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Casualty Co. v. _____________________ Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941). Whether a _______________________ 16 particular case passes the test of adverseness may be influenced by a variety of considerations, such as whether all affected parties are before the court, see Ernst & Young, 45 F.3d at 538- ___ _____________ 39, and whether the controversy as framed permits "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts," Aetna Life Ins. Co. v. Haworth, ___________________ _______ 300 U.S. 227, 241 (1937). The hardship prong of the Abbott Labs paradigm turns on ___________ whether "the challenged action creates a `direct and immediate' dilemma for the parties[.]" W.R. Grace & Co. v. EPA, 959 F.2d _________________ ___ 360, 364 (1st Cir. 1992) (citation omitted). Utility is the flip side of the same coin, and an inquiring court, in assaying the hardship to the parties, may find it revealing to ask whether "granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest." Narragansett Indian Tribe, 19 F.3d at 693. _________________________ Although it is a familiar bromide that courts should not labor to protect a party against harm that is merely remote or contingent, see, e.g., Ernst & Young, 45 F.3d at 536; ___ ____ _______________ Massachusetts Ass'n of Afro-Am. Police, 973 F.2d at 20; Lincoln _______________________________________ _______ House v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990), there is some _____ _____ play in the joints. For example, even when the direct application of a statute is open to a charge of remoteness by reason of a lengthy, built-in time delay before the statute takes 17 effect, ripeness may be found as long as the statute's operation is inevitable (or nearly so). See, e.g., Regional Rail Reorg. ___ ____ ____________________ Act Cases, 419 U.S. 102, 142-43 (1974). And, even when the _________ direct application of such a statute is subject to some degree of contingency, the statute may impose sufficiently serious collateral injuries that an inquiring court will deem the hardship component satisfied. See Erwin Chemerinsky, Federal ___ _______ Jurisdiction 2.4.2, at 121-22 (2d ed. 1994). In general, ____________ collateral effects can rise to this level when a statute indirectly permits private action that causes present harm, or when a party must decide currently whether to expend substantial resources that would be largely or entirely wasted if the issue were later resolved in an unfavorable way. See, e.g., Pacific ___ ____ _______ Gas, 461 U.S. at 201; Duke Power Co. v. Carolina Envtl. Study ___ _______________ _____________________ Group, Inc., 438 U.S. 59, 81-82 (1978). We caution, however, ___________ that in such murky waters generalizations are dangerous, and the weighing of collateral effects is for the most part a judgment call, to be made case by case. VIII. VIII. ____ Applying the Paradigm Applying the Paradigm _____________________ Viewed against this backdrop, we think that Keenan has made a satisfactory showing under both prongs of the Abbott Labs ___________ paradigm. Given the relative certainty of the statute's application, the purity of the legal issue presented, the presence of all necessary parties before the court, the dilemma that Keenan currently faces, and the hardship to him should 18 immediate review be denied, we conclude that he has advanced a ripe claim. The paramount harm to Keenan the eventual reduction in his benefits pursuant to section 7(2)(b ) is distant in time, but its incidence seems highly probable. The Commonwealth has pointed to three contingencies that might shield Keenan from ultimate harm of this kind: (1) he might die before reaching age 65, (2) he might no longer be disabled when he reaches that age, or (3) the challenged statute might be amended prior thereto. There is no evidence in the record to suggest that any of these three contingencies are likely to eventuate. The life expectancy of a man in his mid-50s is roughly 20 years. See, e.g., United ___ ____ States Bureau of the Census, Statistical Abstract of the United __________________________________ States: 1994 Table 116, at 88 (114th ed.); Keenan's disability, ______________ according to state law, is permanent and total, see, e.g., Mass. ___ ____ Gen. L. ch. 32, 7(1) (1989) (providing for accidental disability retirement only when the affected employee is "totally and permanently incapacitated for further duty"); and, though the Commonwealth has drawn our attention to a bill pending in the Massachusetts legislature that would repeal section 7(2)(b ), see ___ 1995 Mass. H.B. 4007, 179th Gen. Court, 1st Sess., previous bills of a similar tenor have failed of enactment. In all events, a litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted. The demise of a party or the repeal of a statute will always be possible in any case of 19 delayed enforcement, yet it is well settled that a time delay, without more, will not render a claim of statutory invalidity unripe if the application of the statute is otherwise sufficiently probable. See Regional Rail Reorg. Act Cases, 419 ___ _______________________________ U.S. at 143; Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, _____________________ _________ 503-08 (1972). The degree of contingency is an important barometer of ripeness in this respect. Compare, e.g., State of _______ ____ ________ Ariz. v. Atchison, Topeka, and Sante Fe R.R. Co., 656 F.2d 398, _____ ________________________________________ 402-03 (9th Cir. 1981) (finding challenge to statute ripe six months before its effective date due to the unlikelihood that the statutory scheme would change in the interim) with, e.g., Ernst & ____ ____ _______ Young, 45 F.3d at 538 (finding claim unripe due in part to the _____ presence of a large number of contingencies, many of which were unlikely to materialize). Here, the relative certainty of Keenan's asserted injury indicates that his claim is suitable for contemporaneous judicial review. Three other circumstances buttress the conclusion that Keenan's claim is ready for adjudication. In the first place, he mounts a facial challenge to the state law, and does so on a stipulated record. Thus, his claim is unabashedly legal, and the district court is capable of resolving it with no further factual exposition. Second, and relatedly, the controversy is narrowly defined and is susceptible to specific relief, adequate to conclude the matter, without speculation or reference to hypothetical facts, and without much risk that the court's opinion will prove superfluous. Last but not least, the case is 20 fully adverse; all the proper parties are before the court. We are equally convinced that allowing the case to proceed, here and now, would serve a useful purpose, and would be of great practical assistance to all concerned. See Narragansett ___ ____________ Indian Tribe, 19 F.3d at 693. Not only is the utility of a ____________ decree obvious in this situation, but this utility also has special force in the context of a challenge to a discriminatory retirement system. In Lorance v. AT&T Technologies, Inc., 490 _______ ________________________ U.S. 900 (1989), the Supreme Court considered the timeliness of a suit challenging a seniority system that allegedly discriminated against women.7 The Court ruled that plaintiffs could sue at the time the seniority system was put in place, without awaiting the adverse effects of its operation. See id. at 905-06. In the ___ ___ bargain, the Justices recognized that the adoption of the plan imposed a "concrete harm" on the plaintiffs even though "the benefits of a seniority system . . . are by their nature speculative if only because they depend upon the employee's continuing desire to work for the particular employer." Id. at ___ 907 n.3. The Court then likened the harm imposed by adoption of an illegal seniority system to that imposed "when an insurance company delivers an accident insurance policy with a face value of $10,000, when what has been paid for is a face value of $25,000." Id. ___  ____________________ 7Although the holding in Lorance has been superseded by _______ statute, see Landgraf v. USI Film Prods., 114 S. Ct. 1483, 1489- ___ ________ _______________ 90 (1994) (describing provisions of Civil Rights Act of 1991), that development does not affect the use that we make of the Court's opinion here. 21 Even though Lorance addressed a different issue when _______ a disparate impact violation of Title VII occurs for purposes of establishing the limitations period we find guidance in the Court's recognition that the adoption of a discriminatory plan may itself impose an injury. So it is here: a ripeness analysis can take into account not only the harm that arises from the reduced value of Keenan's benefits, but also the harm from the state's possible endorsement of age discrimination and the prejudice that underlies it. Moreover, the uncertainty about the validity of section 7(2)(b ) is also imposing a present hardship on Keenan apart from the specter of reduced future benefits. At age 58, people must nail down their plans for financial security in their golden years. Thus, the most immediate harm to Keenan comes in the form of an inability prudently to arrange his fiscal affairs. If Keenan anticipates that his benefits will not be reduced, and guesses wrong, he may find himself inadequately prepared to subsist on the unwanted birthday present a drastically reduced pension that will accompany his attainment of age 65. Conversely, if he anticipates that the statute will be upheld, and guesses wrong, he may needlessly deprive himself in the intervening seven years, preparing for a rainy day that never dawns. We believe that this uncertainty and the considerations of utility that we have mentioned coalesce to show that Keenan is suffering a sufficient present injury to satisfy the second prong of the Abbott Labs paradigm. See, e.g., Pacific Gas, 461 U.S. at ___________ ___ ____ ___________ 22 201; Pierce v. Society of Sisters, 268 U.S. 510, 535-36 (1925) ______ ___________________ (allowing private schools to attack statute requiring public school attendance at a later date because of the statute's tendency to shift students immediately to public schools); Crow ____ Tribe of Indians v. Montana, 819 F.2d 895, 903 (9th Cir. 1987) _________________ _______ (finding justiciability in challenge to state tax on coal based in part on present difficulty in leasing mine), aff'd 484 U.S. _____ 997 (1988); Bob's Home Serv., Inc. v. Warren County, 755 F.2d ________________________ ______________ 625, 627-29 (8th Cir. 1985) (finding ripeness based in part on the reduced property value attributable to a land regulation). Finally, although we recognize that courts have some discretion to grant or withhold declaratory relief, and that this discretion must be exercised cautiously when matters of either public import or constitutional dimension are implicated, see El ___ __ Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 494 (1st Cir. 1992), __________ _______________ the lower court did not squarely reject Keenan's claim in the exercise of its discretion, nor should it have done so. Though the declaratory judgment context may serve to relax a federal court's storied obligation to exercise the jurisdiction given to it by Congress, see Fuller Co. v. Ramon I. Gil, Inc., 782 F.2d ___ __________ ___________________ 306, 308 n.3 (1st Cir. 1986), the decision not to exercise jurisdiction must still be based on a careful balancing of efficiency, fairness, and the interests of both the public and the litigants. See Metropolitan Prop. & Liab. Ins. Co. v. ___ ______________________________________ Kirkwood, 729 F.2d 61, 62 (1st Cir. 1984). In Keenan's case, ________ this calculus strongly favors a contemporaneous adjudication. In 23 addition to the utility of a present determination, the challenged statute is free of ambiguity and straightforward in its operation. There is no basis to suppose that any adjudication will be hampered by factual uncertainty. There is no need to await clarification by a state court. More importantly, Congress gave state and local governments two years between the passage of the OWBPA and its effective date to bring their retirement schemes into compliance. The Commonwealth chose not to bestir itself during this period, and has still not taken legislative action though nearly five years have elapsed. Any deference that might be owed under principles of comity has long since been repaid. The retirement scheme must now face judicial scrutiny.8 IX. IX. __ Conclusion Conclusion __________ We need go no further. Although the district court appropriately granted summary judgment against Riva and Pentland, it improperly dismissed Keenan's claim as unripe.  ____________________ 8Keenan invites us to direct the entry of a judgment in his favor on the merits, noting the district courts statement that "Section 7(2)(b ) is facially discriminatory towards certain state employees over the age of fifty-five." Riva, 871 F. Supp. ____ ____ at 1517. We decline the invitation. The district court's dictum was based in part on its assumption that "[d]efendants do not contest that Section 7(2)(b ) is facially discriminatory under the ADEA as amended by the OWBPA." Id. at 1517 n.5. On appeal, ___ the Commonwealth vehemently denies that it ever conceded the point. Under the circumstances, we think that orderly procedure favors a remand so that the district court may fully consider the merits of Keenan's claim. 24 Affirmed in part, reversed in part, and remanded for Affirmed in part, reversed in part, and remanded for _______________________________________________________ further proceedings consistent herewith. further proceedings consistent herewith. _______________________________________ 25