Beverly C. DAGGETT, et al., Plaintiffs

v.

John D. DEVINE, et al., Defendants.

Civil Nos. 97–56–B–H, 96–359–P–H.

United States District Court,
D. Maine.

Aug. 18, 1997.

Nathaniel M. Rosenblatt, Farrell, Rosenblatt & Russell, Bangor, ME, Mark J. Lopez, American Civil Liberties Union, New York City, for Plaintiffs.

H. Cabanne Howard, Paul Stern, Asst. Atty. Gen., Augusta, ME, for Defendants.

## ORDER ON DEFENDANTS' MOTION TO DISMISS COUNTS IV THROUGH XII OF THE COMPLAINT FILED IN CIVIL NO. 97–56–B–H

HORNBY, Chief Judge.

This lawsuit is a constitutional challenge to Maine's new system of financing election campaigns enacted pursuant to a 1996 ballot initiative and now known as the Maine Clean Election Act ("MCEA"), 21–A M.R.S.A. §§ 1121–1128. The defendants have moved to dismiss Counts IV–XII for lack of standing and ripeness. The motion is GRANTED.

The plaintiffs here are State Senator Beverly C. Daggett who "anticipates" running for re-election in both 1998 and 2000, Compl. ¶ 16; Richard Eaton, Chair of the Libertarian Party of Maine, an unsuccessful candidate for the Maine House of Representatives in 1994 and 1996 who "may choose" to be a candidate in 1998 and 2000, *Id.* ¶ 17; State Representative Elaine Fuller who "anticipates" running again in 1998 and 2000, *id.* ¶ 18; Christopher Hart who "[i]n the past" has made campaign contributions in excess of the new maximums and "anticipates" more of the same "in the future," *id.* ¶ 19; and the Libertarian Party of Maine, which "oppose[s]

state regulation of individual campaigns," *id.* ¶ 20.

Although the MCEA was enacted in 1996, the Act's "alternative campaign financing option available to candidates running for Governor, State Senator and State Representative" does not apply until "elections to be held *beginning in the year 2000.*" 21–A M.R.S.A. § 1123 (emphasis supplied). Therefore, by its terms, none of the provisions of the MCEA challenged in Counts IV through XII will apply in the next statewide election in 1998.

## ANALYSIS

 Ripeness and standing doctrines in the federal courts are designed to ensure justiciability—to satisfy the constitutional and prudential requirements that derive from the mandate of Article III of the Constitution that federal courts decide only "cases or controversies." U.S. CONST. art. III, § 2, cl. 1; *see also Muskrat v. United States,* 219 U.S. 346, 356–57, 31 S.Ct. 250, 253–54, 55 L.Ed. 246 (1911). Federal courts are courts of limited subject matter jurisdiction. *See* U.S. CONST. art. III, § 2, cl. 1. Unlike state courts which can, from time to time, render advisory opinions, the history of federal court jurisprudence is devoted to avoiding advisory opinions. *See Poe v. Ullman,* 367 U.S. 497, 503–07, 81 S.Ct. 1752, 1755–58, 6 L.Ed.2d 989 (1961) (plurality opinion); *see generally* Lawrence H. Tribe, American Constitutional Law § 3–9 (2d ed.1988). One of the primary components of the standing doctrine, for example, is the requirement that the plaintiff in question "suffer[ ] 'some threatened or actual injury' " as a result of the challenged statute. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93

S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)). Additionally, the ripeness doctrine requires that when the relief is "primarily prospective in character," a court must consider "the fitness of the issue for immediate review and the hardship to the litigant should review be postponed." *Riva v. Massachusetts,* 61 F.3d 1003, 1009 (1st Cir.1995). Reluctantly,[1] I conclude that these plaintiffs do not present a justiciable case or controversy.

There is little doubt that these plaintiffs would like an early ruling on the constitutionality of the election laws. If the laws applied to the *1998* election and if Senator Daggett, Mr. Eaton and Representative Fuller were running for *1998* office and if Mr. Hart wanted to contribute more than the new statutory maximum in the 1998 election, I would not hesitate to rule on the merits. *See, e.g., Vote Choice, Inc. v. DiStefano,* 4 F.3d 26, 36–37 (1st Cir.1993). State election campaigns for these plaintiffs in the year 2000, however, are conditioned on too many intervening contingencies to make this matter appropriate for review in federal court now. The outcome of the intervening 1998 election; unforeseen issues confronting the Legislature and the electorate in 1999 and 2000; these politicians' career choices (Maine has a part-time legislature); possible changes of residence; health and family issues; the fundraising situation in the future; political shifts—the list is endless of events or choices that might alter Senator Daggett's and Representative Fuller's anticipated candidacies, Mr. Eaton's possible candidacy and Mr. Hart's willingness to contribute, or even their individual or collective attitudes toward this legislation and thereby affect whether they are injured.[2] Since there will be plenty of time to rule on the dispute after the November 1998 election, there is no hardship in delaying a ruling at this point.[3] (The "qualifying period" that

---

1. I say "reluctantly" because I am all too familiar with the time pressure election law challenges so often bring. *See, e.g., Maine Right to Life Comm., Inc. v. Federal Election Comm'n,* 914 F.Supp. 8 (D.Me.1996), *aff'd,* 98 F.3d 1 (1st Cir. 1996), *petition for cert. filed,* 65 U.S.L.W. 3783 (U.S. May 14, 1997) (No. 96–1818); *Faucher v. Federal Election Comm'n,* 743 F.Supp. 64 (D.Me. 1990), *aff'd,* 928 F.2d 468 (1st Cir.1991), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).

2. The abstract interest of the Libertarian Party of Maine in generally opposing state regulation has not been developed in the plaintiffs' legal brief and I consider it waived on this justiciability issue.

3. In this respect, the case is unlike *Buckley v. Illinois Judicial Inquiry Board,* 997 F.2d 224, 226 (7th Cir.1993) (held that a challenge to rules proscribing certain speech of candidates during their campaigns for seats on the state courts presented a "live controversy" because the "lci-

compels candidates running for office to make and declare certain choices under MCEA does not begin until January 1, 2000, *see* 21–A M.R.S.A. §§ 1122(8) & 1123.[4]) That will be a better time to determine whether any of these plaintiffs still plan to run for election in the 2000 campaign and still are unhappy with this law, and whether Mr. Hart is likely to be a contributor above the maximum levels. I, therefore, do not even address the possibility that an intervening Legislature could amend the statute so as to eliminate some or all of these plaintiffs' complaints against it. I do observe, however, that if a state Legislature—by enacting a statute with a much later date of actual operation—can thereby obtain an interim federal court ruling on its constitutionality, a back door to procuring advisory opinions from federal courts has been opened wide, giving the Legislature an opportunity to modify the statute before it has any practical effect.

I have carefully considered the plaintiffs' caselaw on ripeness and standing and make these comments about the most pertinent cases. While it is true that *Riva* was declared ripe for a constitutional ruling even though the statute would not affect a particular plaintiff until seven years later, that plaintiff had already been declared permanently disabled and the statute (which already affected other individuals directly) would affect him adversely in 2002 unless the statute was repealed or amended or unless he died. *Riva*, 61 F.3d at 1010–11. The MCEA applies to no one at this time, and "anticipat[ion]" of running as a candidate two elections away, Compl. ¶ 16, is hardly a present permanent and total disability. It is in that context that I read *Riva*'s statement:

> The demise of a party or the repeal of a statute will always be possible in any case

of delayed enforcement, yet it is well settled that a time delay, without more, will not render a claim of statutory invalidity unripe if the application of the statute is otherwise sufficiently probable.

61 F.3d at 1011.[5] As the First Circuit also observed in *Riva*, "generalizations are dangerous" in this area "and the weighing of collateral effects is for the most part a judgment call, to be made case by case." *Id.* at 1010. I am aware that in *Thorsted v. Gregoire*, 841 F.Supp. 1068 (W.D.Wash.1994), *aff'd* 75 F.3d 454 (9th Cir.1996), the district court ruled in 1994 on the constitutionality of a Washington state term limits initiative that, by its terms, could not affect an election before 1998. *Id.* at 1071. There, the court found that Speaker of the U.S. House of Representatives Thomas Foley was "clearly an 'object' of Initiative 573; the measure, if enforced, will bar him from the ballot in the future" and therefore that he had standing as an injured party. *Id.* at 1073. Perhaps Congressman Foley's perennial candidacy (he had represented his district since 1965, *id.* at 1072), is enough to distinguish *Thorsted;* in any event I decline to follow it in this case where the intentions of these state candidates seem much less certain of fulfillment. Finally, I am acutely aware of the need to decide election law controversies before any harm is done by an unconstitutional statute, *see Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 300 n. 12, 99 S.Ct. 2301, 2310 n. 12, 60 L.Ed.2d 895 (1979), but as I have already stated there will be time to decide this dispute, if it continues between the parties, after the 1998 election.

In sum, I conclude that the doctrine of justiciability, which "concerns not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention," *Renne v. Geary*, 501

---

sureliness of litigation" made it impossible to challenge the rules during the campaign and receive a decision before the elections occurred).

4. The period is earlier for gubernatorial candidates, namely November 1, 1999, *see* 21–A M.R.S.A. § 1122(8)(a), but none of these plaintiffs claims to be a gubernatorial candidate.

5. Likewise, in *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42

L.Ed.2d 320 (1974), the Supreme Court stated: "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." In our case, however, the "inevitability" of the statute's operation against these plaintiffs is *not* "patent."

U.S. 312, 320, 111 S.Ct. 2331, 2338, 115 L.Ed.2d 288 (1991),[6] counsels against ruling on these issues for these plaintiffs at this time. The period following the 1998 election and before the MCEA provisions actually apply to candidates and donors will be time enough if these particular plaintiffs are still interested in making the same challenge at that time. The motion to dismiss Counts IV through XII is therefore GRANTED.

So ORDERED.

6. I recognize that standing and ripeness are distinct doctrines, but they are "imbricated," *Ernst & Young v. Depositors Econ. Protection Corp.*, 45 F.3d 530, 533 n. 6 (1st Cir.1995), or, as some might say, overlapping. I have, therefore, treated them together.