**NEGB, LLC et al., Plaintiffs**

v.

**WEINSTEIN COMPANY HOLDINGS, LLC et al., Defendants.**

**C.A. No. 07–30001–MAP.**

United States District Court,
D. Massachusetts.

May 18, 2007.

Peter Vickery, Amherst, MA, for Plaintiffs.

Andrea B. Hasegawa, Kathyleen A. O'Brien, Skye H. Donald, Morrison & Foerster LLP, Los Angeles, CA, Carol E. Head, Daniel L. Goldberg, Bingham Mccutchen LLP, Boston, MA, Diane E. Pritchard, Morrison & Foerster LLP, San Francisco, CA, for Defendants.

### MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiffs NEGB, LLC, Nolan Anaya d/b/a Captain Video, and Todd Zafaniacz d/b/a Video Zone, allege that Defendants Genius Products, LLC, Genius Products, Inc., and The Weinstein Company Holdings LLC ("TWC Holdings") are on the verge of embedding a notice within certain DVDs that would falsely imply that independent video store owners ("rentailers"), like the individual Plaintiffs, have no right to rent the DVDs to the public. Their five-count verified complaint asserts claims for: Unfair Competition (Mass. Gen. Laws ch. 93, § 4) (Count One); Unfair or Deceptive Acts and Practices (Mass. Gen. Laws ch. 93A, § 2) (Count Two); Untrue and Misleading Advertisements (Mass. Gen. Laws ch. 266, § 91) (Count Three); Negligent Misrepresentation (Count Four); and Tortious Interference with Advantageous Business Relations (Count Five). (Dkt. No. 1, Ex. A., Compl.5–7.)

Defendants deny Plaintiffs' allegations and have moved to dismiss each count in the complaint on numerous grounds, including, most recently, for lack of ripeness. For the reasons set forth below, this motion will be allowed without prejudice.

### II. STANDARD OF REVIEW

■ "While the court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion...." *Gonzalez v. United States,* 284 F.3d 281, 288 (1st Cir.2002). Indeed, where a defendant challenges the "actual existence of the district court's subject matter jurisdiction" on ripeness grounds, "the pleading's allegations are merely evidence on the issue." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1363 (3d ed.2007).

■ Other evidence may include depositions or affidavits, and a court may even "entertain arguments not raised by the parties' memoranda." *Cutting v. United States,* 204 F.Supp.2d 216, 218–19 (D.Mass. 2002) (citation omitted), *aff'd Skwira v. United States,* 344 F.3d 64 (1st Cir.2003). Though "the various integers that enter into the ripeness equation play out quite differently from case to case." *Ernst & Young v. Depositors Econ. Prot. Corp.,* 45 F.3d 530, 535 (1st Cir.1995) (citation omitted), the burden of establishing ripeness ultimately falls on the party asserting it, *see McBee v. Delica Co., Ltd.,* 417 F.3d 107, 122 (1st Cir.2005) (citation omitted).

## III. BACKGROUND

### A. The Parties.

Nolan Anaya and Todd Zafaniacz are two independent video store owners from Massachusetts; they are the founding members of NEGB, LLC, a Massachusetts organization that represents independent video retailers throughout the country. (Compl. ¶¶ 1–3, 8–9.)

TWC Holdings is a limited liability company organized under the laws of Delaware with a principal place of business in New York City. (*Id.* ¶ 4.) According to filings with the Security and Exchange Commission, this Defendant "conducts substantially all of its business relating to the motion picture industry through operating subsidiaries." (*Id.* ¶ 11 (citation omitted).)

One such subsidiary is The Weinstein Company LLC ("TWC"), "a multi-media company that produces, develops and acquires theatrical pictures for release and acquires rights to other films for distribution on DVD, television, and the Internet." (*Id.*)[1] TWC Holdings also owns an interest in Genius Products, LLC, an independent home-entertainment distribution company whose managing member is Genius Products, Inc. (*Id.* ¶ 12 (citation omitted).)

Genius Products, LLC and Genius Products, Inc. are both Delaware companies with principal places of business in Santa Monica, California. (*Id.* ¶¶ 5–6.)

### B. The Blockbuster Agreement.

In November, 2006, TWC reached a four-year agreement with Blockbuster, Inc. ("Blockbuster"), "a leading global provider of in-home movie[s]." (*Id.* ¶ 14 (citation omitted).) Under the terms of the agreement, TWC agreed to distribute, through Genius Products, LLC, its theatrical and direct-to-video movies intended for rental exclusively to Blockbuster.

Pursuant to the so-called First Sale doctrine,[2] it is undisputed that nothing in the Blockbuster Agreement prevents "rentailers" like the individual Plaintiffs from purchasing DVDs off the shelf at general retailers for inclusion in their rental inventory.

### C. The Drinkwater Interviews.

On November 22, 2006, during an interview with the magazine *Video Business,* Trevor Drinkwater, the President and CEO of Genius Products, Inc., stated:

> With the First Sale doctrine, there's nothing we can do to prohibit someone from walking into Costco and buying the DVD and renting it. That's clear under the law. What we can do as a distributor is brand all the Blockbuster DVDs with the Blockbuster logo, and all the DVDs that are out for sale will be clear to consumers as being for sale only. We'll encourage people to call us if they did rent [a DVD that is labeled for sale]. That's to help control it. But we have a clear understanding of First Sale, and

---

**1.** Technically, "TWC is a wholly owned subsidiary of The Weinstein Company Funding LLC, which is a wholly owned subsidiary of TWC Holdings." (Compl. ¶ 11 (citation omitted).)

**2.** The First Sale Doctrine provides that the owner of a particular copy of a copyrighted work "is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy." 17 U.S.C. § 109(a). "The whole point of the First Sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.,* 523 U.S. 135, 152, 118 S.Ct. 1125, 140 L.Ed.2d 254 (1998).

we aren't going to do anything that goes around it at all.

(*Id.* ¶ 16 (citation omitted).)

In an interview with *Home Media Retailing* on or about that same day, Drinkwater added:

Without getting into a legal discussion, copyright laws don't prohibit The Weinstein Co. from deciding how best to distribute and promote its products, and the Weinstein Co. has determined that having an alliance with Blockbuster as its exclusive retailer will best promote and enhance the value of its products to customers. Because our agreement with Weinstein requires us to honor the company's commitments to Blockbuster, we are implementing our new distribution policy to do so. The Weinstein Co. discs at Blockbuster will carry the Blockbuster logo. In addition, sellthrough product will carry a message telling consumers that the disc is intended for purchase only, and if they have rented it, they will be encouraged to call a toll-free number. In addition to prevalent consumer messaging, we also are considering utilizing visual and digital technologies to mark and track products throughout the supply chain.

(*Id.* ¶ 17.)

Plaintiffs contend that, if implemented, Defendants' policy of marking DVDs sold through retailers as "intended for sale only" and embedding an additional message in the DVD instructing viewers to report to a toll-free number if they have rented it violates the First Sale doctrine. The embedded messages will imply that purchasers like Plaintiff who subsequently rent the video to others are doing something illegal or improper, which Defendants concede they are not.

**D.  *Travel of the Case.***

On December 11, 2006, Plaintiffs brought this action in Hampshire County Superior Court in an attempt to prevent Defendants from "causing any notice, assertion, or representation of any kind to appear on any products ... that would imply or tend to imply that retailers other than Blockbuster who rent the Defendants' DVDs to the public are engaged in any wrongdoing." (*Id.* at 7.) Defendants removed the case to this court on January 4, 2007.

The following morning, Plaintiffs filed one motion for a temporary restraining order and another for a preliminary injunction. (Dkt No. 4, Pls.' Mot. for TRO; Dkt. No. 5, Pls.' Mot. for Prelim. Injunc.) Later that afternoon, it emerged, during argument on the former motion, that: (1) Defendants had embedded, or were in the process of embedding, a brief message on certain DVDs informing consumers that the DVDs were "intended for sale only"; (2) only one DVD containing this message was about to enter the marketplace; and (3) Defendants had not effectuated Drinkwater's expressed intention to embed a message encouraging consumers to call a toll-free number if they happened to rent one of the DVDs "intended for sale only."

In light of this information, Plaintiffs conceded that there was no need for immediate injunctive relief. The motion for a temporary restraining order was therefore denied. However, due to Plaintiffs' professed concerns regarding the impact of the "intended for sale only" message, the court gave the parties a briefing schedule and date to return for argument on Plaintiffs' motion for a preliminary injunction.

In conjunction with their opposition to this motion, Defendants submitted the affidavit of Rodney Satterwhite, the CEO of Genius, LLC, who confirmed the absence of a toll-free number message on any of Defendants' DVDs. (Dkt. No. 15, Satterwhite Aff. ¶¶ 6–7 (noting the absence of any "immediate plans" on the part of De-

fendants "to add such a message"); *see also* Dkt. No. 16, Radiloff Aff. ¶ 8 (acknowledging that Defendants had considered "placing an ... embedded message on ... TWC DVDs requesting that consumers call a toll-free number to notify Genius Products if they ha[d] rented the TWC DVDs from a rentailer other than Blockbuster").)

Satterwhite also stated that a court order requiring Defendants to re-author and reproduce DVDs containing the "intended for sale only" message would cost Defendants several million dollars, cause delays in distribution, and leave them vulnerable to suits from numerous retailers. (Satterwhite Aff. ¶¶ 13–15.) Significantly, Plaintiffs provided no affidavits, but instead relied upon the allegations set forth in their verified complaint.

On January 18, 2007, counsel appeared for argument on Plaintiffs' motion for a preliminary injunction. Notwithstanding Defendants' contentions to the contrary, the court noted its concern that Defendants' product labeling *could* give rise to a viable cause of action if such labeling implied criminality or wrongdoing on the part of rentailers such as Plaintiffs. However, based on Plaintiffs' inability to establish irreparable harm or a balance of harm in their favor, the court denied their motion for a preliminary injunction.

On February 2, 2007, Defendants moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6). Among other things, they argued that Plaintiffs could not satisfy Chapter 93A's jurisdictional requirement by showing that the conduct at issue occurred, or had its competitive impact, "primarily and substantially" in Massachusetts.

In response to this argument, Plaintiffs emphasized that "[t]he activity that forms the basis of the allegations in the Verified Complaint (distributing DVDs bearing the toll-free-number message) has yet to oc-

cur." (Dkt. No. 26, Pls.' Opp'n to Defs.' Mot. to Dismiss 12.) Consequently, Plaintiffs took the position that it was premature to consider the question of "where exactly the threatened toll-free-number message would have its 'primary' impact." (*Id.* at 7.)

After Defendants filed a reply brief, Plaintiff went one step further by acknowledging that

If the case was about nothing more than the intended-for-sale-only message, the Defendants might have an arguable point that "nothing in the alleged product labeling remotely suggests that plaintiffs are actually engaged in any criminal wrongdoing." In and of itself, the intended-for-sale-only message would not imply criminality.... [T]he suggestion of wrongdoing is in the toll-free number notice....

(Dkt. No. 28, Pls.' Sur–Reply 2 (citation omitted); *see also id.* at 3 ("It is the ... toll-free number notice. that would mislead the public.").)

On March 9, 2007, during oral presentations on the motion to dismiss, the argument took an unexpected turn. Noting Plaintiffs' concession that the "intended for sale only" message did not imply criminality, Defendants raised the question of whether this case remained ripe for judicial action since that message was the only "notice, assertion, or representation" that had been embedded. In other words, the conduct Plaintiffs considered actionable, embedding the message with the toll-free number in the DVD, had not occurred and might not ever occur.

## IV. DISCUSSION

"[T]he doctrine of ripeness ... asks whether an injury that has not yet happened is sufficiently likely to happen to warrant judicial review." *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198,

205 (1st Cir.2002) (internal quotation marks omitted), *cert denied,* 537 U.S. 827, 123 S.Ct. 121, 154 L.Ed.2d 39 (2002). While the doctrine is a product of the Article III case or controversy requirement, it is also grounded in "prudential considerations." *Mangual v. Rotger–Sabat,* 317 F.3d 45, 59 (1st Cir.2003) (citations omitted).

"One such consideration is the need 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Doe v. Bush,* 323 F.3d 133, 138 (1st Cir. 2003) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)), *rehr'g denied* by *John Doe I v. Bush,* 322 F.3d 109 (1st Cir.2003). Another consideration stems from the realization that, "by waiting until a case is fully developed before deciding it, courts benefit from a focus sharpened by particular facts." *Id.* (citing *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 736, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998)); *see also Mangual,* 317 F.3d at 59 (observing that "if elements of the case are uncertain, delay may see the dissipation of the legal dispute without need for decision").

■ Determining ripeness requires an assessment of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *McInnis–Misenor v. Me. Med. Ctr.,* 319 F.3d 63, 70 (1st Cir.2003) (quoting *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507). While a plaintiff must present evidence sufficient to satisfy both prongs of the test, *R.I. Ass'n of Realtors, Inc. v. Whitehouse,* 199 F.3d 26, 33 (1st Cir.1999) (citation omitted), "a very strong showing on one axis may compensate for a relatively weak showing on the other," *Stern v. United States Dist. Court for Dist. of Mass.,* 214 F.3d 4, 10 (1st Cir.2000) (citation omitted), *cert. denied, Crane v. Stern,* 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954 (2001).

■ In conducting the fitness inquiry, a trial judge must begin by asking "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Ernst & Young,* 45 F.3d at 536 (quoting *Mass. Ass'n of Afro–Am. Police, Inc. v. Boston Police Dep't,* 973 F.2d 18, 20 (1st Cir.1992) (per curiam)). According to the First Circuit,

A second important factor in the fitness calculus is the extent to which the claim is bound up in the facts. Courts are [less] likely to find a claim ripe if . . . the absence of a concrete factual situation seriously inhibits the weighing of competing interests. . . .

*Riva v. Commonwealth of Mass.,* 61 F.3d 1003, 1009–10 (1st Cir.1995) (internal citations omitted).

With respect to the question of hardship, courts must consider "whether the challenged action creates a 'direct and immediate' dilemma for the parties." *W.R. Grace & Co. v. United States Envtl. Prot. Agency,* 959 F.2d 360, 364 (1st Cir.1992). "This inquiry encompasses the question of whether plaintiff is suffering any present injury from a future contemplated event." *McInnis–Misenor,* 319 F.3d at 70 (citations omitted).

■ Applying these criteria to the facts set forth above, it is clear that this matter ceased to be ripe when Plaintiffs acknowledged that the "intend for sale only" message did not, in and of itself, imply wrongdoing on the part of the rentailer. *See Arturet Velez v. R.J. Reynolds Tobacco Co.,* 429 F.3d 10, 13 n. 2 (1st Cir.2005) (noting that, even on a Rule 12(b)(6) motion, courts may consider "concessions" by the plaintiff in "response to the motion to dismiss" (citations omitted)).

Turning first to the question of fitness, Plaintiffs contend that it is only a matter of time before Defendants give effect to Drinkwater's stated intention to embed a

message destined to tarnish the business reputations of independent video store owners.

Assuming, for the moment, that the implementation of a toll-free number message is inevitable, there is scant evidence concerning the form it will take. Indeed, according to Defendants, such a message has not even been drafted.

Certainly, it is not difficult to hypothecate a future message capable of misrepresenting Plaintiffs' rights under the First Sale doctrine. As Defendants themselves appear to recognize, it would be improper for them to embed a message that stated: "Rental of this DVD constitutes a criminal violation of the Copyright Act. Please call this 800 number to let us know if you rented it." (Dkt. No. 29, Defs.' Supplemental Mem. in Supp. of Mot. to Dismiss 4.)

By the same token, it is just as easy to imagine an innocuous notice incapable of giving rise to any colorable claim. For instance, it seems unlikely that Plaintiffs would continue to pursue this action if Defendants embedded a message that stated: "While no one has done anything wrong or improper in renting you this DVD, we'd like to know if you have rented it. Please call this toll-free number." (*Id.*)

As the foregoing examples illustrate, this is an instance where "the absence of a concrete factual situation seriously inhibits the weighing of competing interests." *Riva*, 61 F.3d at 1010. Whereas permitting this action to proceed would require this court to expend "scarce resources in what amounts to shadow boxing," *Ernst & Young*, 45 F.3d at 537, withholding consideration until (if ever) an actual toll-free number notice exists will "ensure [a] fair, focused, and intelligent analysis of the issues presented," *W.R. Grace*, 959 F.2d at 365.[3]

Of course, the fact that a toll-free number notice "may never come to pass" also "augurs against a finding of fitness." *McInnis–Misenor*, 319 F.3d at 72. While Plaintiffs are correct in noting the arguably unequivocal nature of the comments Drinkwater made in November, 2006, the toll-free number notice he proclaimed has not been embedded and, it would appear, not even composed as yet.

Plaintiffs are thus left arguing that the implementation of the "intended for sale only" message, which Drinkwater announced at the same time, suggests that the toll-free number notice is in the pipeline. However, one could just as easily draw the opposite conclusion, *i.e.* the idea of a toll-free number message has been relegated to the proverbial back burner.

To be sure, this is not a case where the feared injury depends upon a long series of speculative events involving third parties. Cf. *Ernst & Young*, 45 F.3d at 538; *McInnis–Misenor*, 319 F.3d at 72–73. As Plaintiffs point out,

> Just one contingent factor stands between the status quo and the production of DVDs bearing the toll-free number warning, and that is the Defendants' decision to turn its non-immediate plans into immediate plans.

(Dkt. No. 30, Pls.' Opp'n to Defs.' Supplemental Mem. in Supp. of Mot. to Dismiss 6.)

■ However, it bears noting that Defendants are by no means unaware of the

---

**3.** Cf. *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478 (2d Cir.1999) ("[A] court entertaining [plaintiff's] challenge would be forced to guess at how [defendant] might apply [its] directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical. Such an open-ended and indefinite challenge is not well suited to judicial decision."), *cert. denied*, 528 U.S. 869, 120 S.Ct. 169, 145 L.Ed.2d 143 (1999).

potential problems with their product labeling. (*See* Dkt. No. 31, Mot. to Dismiss Hr'g Tr. 38:14–15, Mar. 9, 2007 ("[W]e're not deaf to what the court has said.").) During oral argument on the motion to dismiss, counsel for Defendants made it clear that his clients were:

> not deaf to the notion that there's been a challenge to this, and therefore, for example, if and when they get around to drafting a 800 number notice, they may put the additional bells and whistles in it … to deflate any conceivable claim. …

(Mot. to Dismiss Hr'g Tr. 38:16–23, Mar. 9, 2007; *see also id.* 39:5–6 (noting that such decision would be the product of "practical business judgment").) In short, fitness becomes even more difficult to show when "the party with the power to inflict the feared injury ha[s] expressly disclaimed any intent to do so." *Stern*, 214 F.3d at 12 n. 2 (citing *Ass'n of Afro–American Police*, 973 F.2d at 20–21).

Plaintiffs fare no better in establishing hardship. While the prospect of defending their business reputations against a potentially misleading 1–800–number notice may be unappealing, it is well-settled that the second "prong of the ripeness analysis is unconcerned with … wholly contingent harm." *W.R. Grace*, 959 F.2d at 367. As noted above, it is unclear whether Defendants will ever embed a toll-free number notice and, if they do, what its content will be.

On the one hand, this ambiguity regarding Defendants' plans for a toll-free number notice is obviously a source of concern for Plaintiffs. Until Defendants draft a message with "bells and whistles" destined to "deflate any conceivable claim" (or announce their intention to forgo the idea of 1–800–number message altogether), Plaintiffs will be forced to remain on the watch for product labeling that might cause customers to look askance at their business practices.

On the other hand, the uncertainty regarding the propriety of the proposed toll-free number notice also encourages Defendants to think twice before crafting a message that might lead a reasonable consumer to misconstrue Plaintiffs' rights under the First Sale doctrine. "This shifting array of possibilities, tilting first in one direction and then in the other, further dilutes [Plaintiffs'] claim of an intolerable hardship." *Ernst & Young*, 45 F.3d at 540 n. 15.

In sum, the court finds that Plaintiffs have not met their burden of establishing the continued existence of this court's subject matter jurisdiction. This matter is no longer fit for judicial review and postponing a decision on the merits will not pose a direct and immediate dilemma for Plaintiffs.

## V. *CONCLUSION*

Based on the foregoing, the court hereby ALLOWS Defendants' Motion to Dismiss (Dkt. No. 23) WITHOUT PREJUDICE to refiling if subsequent developments persuade Plaintiffs that they have suffered a cognizable injury ripe for adjudication.[4]

The clerk will enter judgment for Defendants on all counts. This case may now be closed.

It is So Ordered.

---

4. Because of the prominence of the ripeness issue, the court has not addressed Defendants' forceful argument that no claim under Mass. Gen. Laws ch. 93A will lie, since "the center of gravity of the circumstances that give rise to the claim" is not "primarily and substantially" in Massachusetts.